Argued January 18; affirmed July 30, 1935

# VALLEY & SILETZ RAILROAD CO. *v.*
# THOMAS ET AL.

(48 P. (2d) 358)

*James G. Wilson*, of Portland (C. L. Starr and Wilson & Reilly, all of Portland, on the brief), for appellant.

*I. H. Van Winkle*, Attorney General, and *Willis S. Moore*, Assistant Attorney General, for respondent Charles M. Thomas.

*William P. Ellis*, of Salem, and *Wallace McCamant*, of Portland (William P. Ellis, of Salem, and McCamant, Thompson & King, of Portland, on the brief), for respondent Charles K. Spaulding Logging Co.

BAILEY, J. This suit was instituted in the circuit court of Marion county, Oregon, by Valley & Siletz Railroad Company, against the public utilities commissioner of Oregon, to set aside an order previously made by that officer fixing the maximum carload rate on log shipments from Olson, on the Valley & Siletz line in Polk county, to Winona, on a branch line of the Southern Pacific Company in the same county. The order of the commissioner also prescribed other rates on carload shipment of logs between points on the Valley & Siletz line. The Charles K. Spaulding Logging Company, a corporation, hereinafter to be referred to as the Spaulding Company, was permitted to intervene as a party defendant.

On December 13, 1932, the Spaulding Company filed a complaint with the commissioner, naming the Valley & Siletz Railroad Company and the Southern Pacific Company as defendants, alleging that the joint rates of $3.90 per thousand feet, board measure, on logs between Olson and Winona were unreasonable and unjust. After an extensive hearing the commissioner on May 17, 1933, entered an order, in which, after referring to the testimony introduced, he made the following finding:

"From a careful consideration of the entire record in this proceeding and based thereon, I am of the opinion and find:

"That the present joint-line haul rate of respondent carriers applicable to the transportation of carload shipments of saw-logs shipped from Olson and nearby shipping points located on the Valley & Siletz Railroad Company to Winona, Oregon, located on Southern Pacific Company's line, in so far as same exceeds the rates and charges hereinafter prescribed, is unjust and unreasonable; * * *

"That just, reasonable and lawful rates and charges for the future, to be applied jointly and locally by defendant carriers for the transportation of carload shipments of saw-logs between points on their lines, shall not exceed the following: from Olson, Oregon, and nearby shipping points to Winona, Oregon, applicable to loads of fifteen or more carloads shipped at one time, based on the use of cars not exceeding forty-three feet in length, $18 per carload. Applicable to shipments in loads of less than fifteen carloads, $3 per thousand feet B. M., carload minimum six thousand feet B. M."

Upon the hearing before the circuit court additional testimony was introduced and the matter was, pursuant to § 62-138, Oregon Code 1930, resubmitted to the commissioner. After referring to the testimony introduced in the circuit court the commissioner found that his former order should be revised by eliminating therefrom all rates except those applying to carload shipments of logs between Olson and Winona, and that such order should be further amended by providing "that a just, reasonable and lawful rate and charge for the future, to be applied jointly by defendant carriers for the transportation of carload shipments of saw-logs, based on the use of cars not exceeding forty-three feet in length, applicable to shipments of one or more carloads shipped at one time from Olson, Oregon, and nearby shipping points to Winona, Oregon, is and for the future shall be $20 per carload".

The circuit court entered a decree for the defendants, and the plaintiff has appealed.

Before discussing in detail the facts relating to the rates prescribed by the commissioner, we shall dispose of the first two assignments of error presented by the appellant in its brief.

■ It is first insisted that the order of the commissioner is void, on the ground that he did not make detailed and specific findings of fact relating to the matter before him, and that the failure to make such findings of fact invalidates his entire order. This contention is based on the wording of §§ 62-125 and 62-134, Oregon Code 1930. The first of these sections, with reference to investigation of rates, provides that "if upon such investigation the rate or rates, fares, charges * * * or any joint rate or rates * * * or service complained of, *shall be found* to be unreasonable," the public utilities commissioner "shall have power to fix and order substituted therefor such rate or rates" as he "shall have determined to be just and reasonable and which shall be charged, imposed and followed in the future".

Section 62-134, as far as material here, is as follows: "Whenever, upon an investigation made under the provisions of this act", the public utilities commissioner "shall find any existing rate or rates, fares, charges, or classifications, or any joint rate or rates * * * affecting the transportation of * * * property * * * are unreasonable" he "shall determine and by order fix a reasonable rate, fare * * * or joint rate to be imposed, observed, and followed in the future in lieu of that found to be unreasonable".

The commissioner is granted power to change existing rates only in the event that he finds such rates unreasonable. The law does not confer upon him legislative authority to require the substitution of other and different rates as in his discretion he may from time to time deem desirable. He is given authority to prescribe other and different rates only in such instances as he finds existing charges unreasonable.

The sections of the code above referred to do not require the commissioner to make what commonly is considered a finding of fact. They merely provide that, in the event he finds certain rates to be unreasonable, it then becomes his duty to prescribe what are reasonable rates. In the order above mentioned he found definitely that certain rates were unreasonable and specified what would be reasonable rates.

In *United States v. Baltimore & O. R. Company,* 293 U. S. 454 (55 S. Ct. 268, 79 L. Ed. 301), the court pointed out that an order of the interstate commerce commission could not be supported where there was complete absence of the basic or essential findings required to give the commission jurisdiction of the matter. With further reference to this subject, the court there said:

"In the *Florida* case the legal distinction was pointed out between what may be termed quasi-jurisdictional findings, there held to be indispensable, and the 'complete statement of the grounds of the commission's determination' which was declared in *Beaumont, S. L. & W. R. Co. v. United States,* 282 U. S. 74, 86, to be desirable for a proper consideration of the case in the courts. The lack of such a complete statement, while always regrettable, because unnecessarily increasing the labor of the reviewing court, compare *Virginian R. Co. v. United States,* 272 U. S. 658, 675, is not fatal to the validity of the order. It is true that formal and precise findings are not required, under § 14 (1) of the Interstate Commerce Act, which declares that the report 'shall state the conclusions of the commission together with its decision.' Compare *Manufacturers R. Co. v. United States,* 246 U. S. 457, 487; *Meeker v. Lehigh Valley R. Co.,* 236 U. S. 412, 428. That provision relieves the commission from making comprehensive findings of fact similar to those required by Equity Rule 70½. But § 14 (1) does not remove the necessity of making, where orders are subject to

judicial review, quasi-jurisdictional findings essential to their constitutional or statutory validity.''

In *Wichita R. & Light Co. v. Public Utilities Commission,* 260 U. S. 48 (67 L. Ed. 124, 43 S. Ct. 51), relied upon by the appellant herein, it was held that the order of the commission failed to find the existing rates to be unjust and unreasonable, and that the commission under the Kansas law had no power to substitute other rates unless it did so find. In support of this conclusion the court cited *Public Utilities Commission v. Springfield Gas Company,* 291 Ill. 209 (125 N. E. 891). In the Illinois case, with reference to the duty of the regulatory body of that state, the court quoted from the Public Utilities Act as follows:

''At the conclusion of such hearing the commission shall make and render findings concerning the subject matter and facts inquired into, and enter its order based thereon.''

It will readily be seen that the requirements of the Illinois act are more exacting, as to what the findings shall consist of, than those of the Oregon statute. Although the Illinois case was cited by the United States supreme court in *Wichita R. & Light Co. v. Public Utilities Commission,* supra, there is nothing in the opinion in the latter case from which it can be inferred that anything more is necessary than the quasi-jurisdictional findings, that is, of the unreasonableness of existing rates.

Following the Illinois decision is the case of *Northern Pacific Railway Company v. Baker,* 3 F. Supp. 1, which is based upon a statutory provision closely similar to, if not identical with, the Illinois act, requiring the department of public works of the state of Washington to ''make and render findings concerning the subject matter and facts inquired into''.

In *State of Florida v. United States,* 282 U. S. 194 (75 L. Ed. 291, 51 S. Ct. 119), it was held that before the interstate commerce commission could fix intrastate rates it was necessary for that body to make a finding as to the effect of such rates on interstate rates, and without such a finding it had no legislative authority to act.

In the case at bar the railroad companies, in the hearing before the public utilities commissioner, introduced in evidence copies of numerous orders of the public service commission of Oregon (predecessor of the public utilities commissioner) passing upon the reasonableness of rates on various commodities on different railroad lines in this state. The findings included in those orders were not, in most instances, any more specific or detailed than the one in the case now before us.

The sufficiency of the commissioner's findings was questioned for the first time by the appellant in its pleading by amendment of the complaint after the cause was submitted to the circuit court for its decision.

As said in the case of *United States v. Baltimore & O. R. Company,* supra, it would be "desirable for proper consideration of the case in the courts" that a complete statement of the grounds of the commissioner's determination be given, and the lack of such a complete statement is always regrettable. The failure, however, in a case of this nature, to make comprehensive findings of fact does not invalidate the order prescribing new rates. A "basic or essential" finding that the existing rates are unreasonable is all that the statute demands.

See, also, in this connection, *Mills v. Lehigh Valley Railroad Company,* 238 U. S. 473 (59 L. Ed. 1414, 35 S. Ct. 888).

■■ In its second assignment of error the appellant contends that the public utilities commissioner had no jurisdiction or authority, on the pleadings before him, to change the rate on logs from one based on scale measurements to one on carload lots. In support of this argument it is pointed out by the appellant that the complaint of the Spaulding Company filed with the commissioner did not ask for a change in the basis of the rate but merely objected to the rates then in effect as unreasonable.

The case of *Northern Pacific Railway Company v. Baker,* supra, is relied upon in support of this assignment. In that instance the court held that the change made by the department of public works of the state of Washington, from scale measurement of logs to carloads, was arbitrary as shown by the reasons advanced by the department. The conclusion of the court was not based upon the insufficiency of the complaint before that department.

In the case at bar, on the hearing before the commissioner much of the testimony was directed to a comparison of carload rates on logs in this and adjoining states. The fact was brought out that on many of the roads rates were based on carloads rather than scale measurements. It was further pointed out that one of the principal reasons for basing rates on carload lots was to eliminate the cost of scaling logs and obtaining computation of freight revenue, also to avoid dispute as to the accuracy of such computation.

The evidence before the commissioner was to the effect that the average carload of logs during the year 1929, which was the last year of normal log shipments

on appellant's road, was one of 7,890 feet, and for the five years 1926 to 1930, inclusive, the average carload was 7,520 feet. It must be assumed that the rate of $20 per car fixed by the commissioner had reference to the average carload as established by the evidence submitted to him.

In attacking the commissioner's order, the appellant alleged in its complaint in the circuit court that the fixing of rates on carload lots would tend to overloading of the cars, with greatly increased damage to the roadbed and equipment, also increase in loss of logs in transportation and additional expense for salvaging and reloading such logs, and would "result in largely increased claims for damages for loss of logs and injury to employees and other persons". In its brief the appellant seems to have abandoned, to a large extent if not entirely, the foregoing objections to carload rates raised in its complaint. This undoubtedly is due to the fact that no evidence was introduced, either before the commissioner or at the hearing in court, which could be said to sustain with any degree of certainty such grounds of objection.

In the event, however, that any abuse in this respect may develop, the commissioner has not only ample authority to limit the load but it will be his duty to enforce regulations to carry out the intent of the order, which doubtless is that the average load shall not exceed what the evidence shows it to have been in the past. To set aside the order on the conjectural ground that it will permit overloading of cars would be to treat too lightly the commissioner's authority and to underestimate the scope of his supervisory powers.

■ The remaining two assignments of error assail the carload rates on logs fixed by the commissioner as being confiscatory of appellant's railroad facilities and

property. In the discussion of this subject much is said concerning the evidence as to the effect of such rates with reference to the Southern Pacific Company. Both the Valley & Siletz Railroad Company and the Southern Pacific Company were named as defendants in the proceeding before the commissioner. The only rate here in question is a joint one applying to lines of both companies. When an attempt was made by the complainant to show the division of the then existing joint rate between the two lines, counsel for the interested carriers objected, on the ground that this question was not involved, and the objection was sustained by the examiner.

The Southern Pacific Company has not questioned the order of the commisisoner, and therefore it must be assumed that the rates prescribed by him are satisfactory to that railroad. The Valley & Siletz Railroad Company, however, seems to presume that the Southern Pacific Company has just grounds of complaint against the commissioner's order. Any imaginary cause of grievance on the part of the latter company can not avail the Valley & Siletz Railroad Company in its attack on the rates in question.

As was said in *Aetna Insurance Company v. Hyde*, 275 U. S. 440, 446 (72 L. Ed. 357, 48 S. Ct. 174):

"Companies whose constitutional rights are not infringed may not better their position by urging the cause of others. Supervisors v. Stanley, 105 U. S. 305, 311; Heald v. District of Columbia, 259 U. S. 114, 123. * * * Rates sufficient to yield adequate returns to some may be confiscatory when applied to the business of others. But the latter have no constitutional right to prevent their enforcement against the former."

The appellant in attacking the rates prescribed by the commissioner alleges that such rates "will not

provide revenue sufficient to earn its proportion of the said reasonable, or any, return upon the capital investment of plaintiff in said line and said rates as so prescribed are and will be confiscatory of the property of the plaintiff devoted and used in furnishing said service. * * * For a number of years last past plaintiff has not been able to, and is not now earning even its operating expenses and taxes and is and has been for a number of years last past making no return either to the amortization of said line or a reasonable return on its capital investment therein''.

■ Also contained in the complaint are general allegations that the rate prescribed by the commissioner ''is a taking of the property of the plaintiff without due process of law''.

In *Aetna Insurance Company v. Hyde,* supra, the court, in referring to proceedings to set aside rates as confiscatory, observed:

''The complaint was framed to secure judicial review (§ 6284) of the determination of the respondent. The ground of attack was that the aggregate profits were not excessive and that the aggregate collections permitted under the reduced rates were too low. Allegations asserting in general language that the findings, order and reduced rates are confiscatory and repugnant to the Fourteenth Amendment are not sufficient. In order to invoke the constitutional protection, the facts relied on to restrain the enforcement of rates prescribed under the sanction of state law must be specifically set forth, and from them it must clearly appear that the rates would necessarily deny to the plaintiff just compensation and deprive it of its property without due process of law. Louisville & Nashville R. R. Co. v. Garrett, 231 U. S. 298, 314; Atlantic Coast Line v. Florida, 203 U. S. 256. Jurisdiction of this court to set aside state-made rates as confiscatory will be exercised only in clear cases. And the burden is on one seeking that relief to bring forward and satisfactorily prove the invalidating facts. Chicago, &c Ry. Co. v.

Wellman, 143 U. S. 339, 344-345; San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 441, 446; Knoxville v. Water Co., 212 U. S. 1, 8, 16; The Minnesota Rate Cases, 230 U. S. 352, 433, 452; Brush Elec. Co. v. Galveston, 262 U. S. 443, 446.''

The supreme court of the United States in *Beaumont S. L. & W. R. Company v. United States,* 282 U. S. 74, 88 (75 L. Ed. 221, 51 S. Ct. 1), said:

''Appellants claim that the commission's order, if enforced, will operate to deprive them of their property without due process of law in violation of the Fifth Amendment to the Constitution.

''It is well established by the decisions of this court that, in order to invoke such constitutional protection, the facts relied upon to prevent enforcement of rates prescribed by governmental authority must be specifically alleged and from them it must clearly appear that the enforcement of the measure complained of will necessarily deny to the utility the just compensation safeguarded to it by the Constitution. Aetna Insurance Co. v. Hyde, 275 U. S. 440, 447-8, and cases cited. * * * There is no allegation in the complaint, or evidence in the record to show that any division to any of the appellants will not yield operating expenses chargeable to the service covered by it plus a reasonable return on property value fairly attributable to that service.''

The complaint in the case before us does not specifically allege facts showing or tending to show that the rates involved are confiscatory of plaintiff's property. The allegations in that respect are merely conclusions.

Passing for the time being the sufficiency of the complaint, we shall turn to other phases of the case, after briefly reviewing the functions of the court in cases of this nature, wherein it is contended that rates prescribed by legislative authority are confiscatory.

In *Los Angeles Gas & Electric Corporation v. Railroad Commission,* 289 U. S. 287, 304 (77 L. Ed. 1180, 53 S. Ct. 637), it is said:

"We approach the decision of the particular questions thus presented in the light of the general principles this court has frequently declared. We have emphasized the distinctive function of the court. We do not sit as a board of revision, but to enforce constitutional rights. San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 446. The legislative discretion implied in the rate making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative determination as well as that determination itself. We are not concerned with either, so long as constitutional limitations are not transgressed. When the legislative method is disclosed, it may have a definite bearing upon the validity of the result reached, but the judicial function does not go beyond the decision of the constitutional question. That question is whether the rates as fixed are confiscatory. And upon that question the complainant has the burden of proof and the court may not interfere with the exercise of the state's authority unless confiscation is clearly established."

Again, in *Mississippi Valley Barge Line Company v. United States,* 292 U. S. 282, 286 (78 L. Ed. 1260, 54 S. Ct. 692), we find this statement:

"The structure of a rate schedule calls in peculiar measure for the use of that enlightened judgment which the commission by training and experience is qualified to form. Florida v. United States, 292 U. S. 1. It is not the province of a court to absorb this function to itself. I. C. C. v. Louisville & Nashville R. Co., 227 U. S. 88, 100; Western Paper Makers' Chemical Co. v. United States, 271 U. S. 268, 271; Virginian R. Co. v. United States, 272 U. S. 658, 663. The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body."

The court in *State of Florida v. United States,* 292 U. S. 1, 12 (78 L. Ed. 1077, 54 S. Ct. 603), observed as follows:

"The question of the weight of the evidence was for the commission and not for the court. * * * The purpose for which the commission was created was to bring into existence a body which, from its special character, would be best fitted to determine, among other things, whether upon the facts in a given case there is an unjust discrimination against interstate commerce. United States v. Louisville & Nashville R. R. Co., 235 U. S. 314, 320. That purpose unquestionably extended to the prohibited discrimination produced by intrastate rates. In relation to such a discrimination, as in other matters, when the commission exercises its authority upon due hearing, as prescribed, and without error in the application of rules of law, its findings of fact supported by substantial evidence are not subject to review. It is not the province of the courts to substitute their judgment for that of the commission." [Citing numerous authorities.]

In *West Ohio Gas Company v. Public Utilities Commission,* 294 U. S. 63 (79 L. Ed. 274, 55 S. Ct. 316), it is said:

"This court does not sit as a board of revision with power to review the action of administrative agencies upon grounds unrelated to the maintenance of constitutional immunities. Los Angeles Gas & Electric Corporation v. Railroad Commission of California, 289 U. S. 287. Our inquiry in rate cases coming here from the state courts is whether the action of the state officials in the totality of its consequences is consistent with the enjoyment by the regulated utility of a revenue something higher than the line of confiscation. If this level is attained, and attained with suitable opportunity through evidence and argument (Southern Ry. Co. v. Virginia, 290 U. S. 190) to challenge the result, there is no denial of due process, though the proceeding is shot through with irregularity or error."

It is essential to a clear understanding of this case to refer briefly to some of the more pertinent facts concerning the organization and operation of the Valley & Siletz railroad.

The William W. Mitchell Company, a Wisconsin corporation, hereinafter to be referred to as the Mitchell Company, sometime prior to 1910 became owner of a large tract of timber land near Valsetz in Polk county. In 1910 a forest fire burned over approximately 4,000 acres of this land, and to salvage the burned timber it was necessary to build a railroad into the Mitchell tract. The stockholders of the Mitchell Company organized, in 1912, the Valley & Siletz Railroad Company, built the railroad and put it into operation as a common carrier in 1918.

The road extends from Independence, Polk county, in a general westerly direction following the Luckiamute river, to the station of Olson in that county, a distance of 35.6 miles, thence in a northwesterly direction to the town of Valsetz, a total distance of 40.6 miles from Independence. The construction of this road was well described by Mr. J. P. Newell, who at the time of the trial had had 46 years experience as a consulting engineer, 20 years of which were spent in the location, building and maintenance of railroad lines, and 22 years as a consulting engineer for the public service commission of Oregon. In his testimony before the commissioner, Mr. Newell explained the construction of this railroad as follows:

"The road crosses level territory in the Willamette valley for about twenty-five miles of its total forty, and then enters the canyon of the Luckiamute river, which is fairly open for a considerable distance up the canyon. Steep grades cover about ten miles all told. Part of that is only about one and one-half per cent

grade, but it runs up to a three per cent grade, which covers about three miles. There are some five or six miles of quite heavy work. The work for the rest of the distance is—there are three or four miles of moderately heavy work, and all the rest of it could be classed as light construction. I mean by that easy construction. The road is, for a logging road, quite unusually well built. It is a fairly good branch line permanent road. The curvature is as light, I would say, as could reasonably be made in that sort of country. It has no very sharp curves anywhere and not many that are even moderately sharp. The roadbed has been constructed of a reasonable width. I noted particularly one thing that is not always observed, especially in logging roads, that across all the flat country of the Willamette valley it has been raised a little above the general level, instead of being laid, as it is quite often laid, right flat on the ground. It has been put upon a little embankment so that it is well drained and more easily maintained than it would be had it been cheaper in that respect. The rail is as heavy as could be reasonably used on such a road. It is well tied. There is a moderate amount of ballast. I would say that it would class as a good example of a well constructed branch line road.''

The three per cent grade mentioned by Mr. Newell is between Valsetz and Olson, beyond the shipping points of the Spaulding Company; and from Olson to Independence the track is either level or on a down grade.

The Spaulding Company began shipping logs over this line to Winona on the Southern Pacific branch line in 1918. From that year to and including 1929 this company paid to the Valley & Siletz railroad and the Southern Pacific $784,617 on outbound log shipments, and in excess of $100,000 on inbound freight.

In 1920 the Mitchell Company through an affiliated corporation completed a large sawmill at Valsetz.

Originally its timber holdings in that vicinity aggregated 1,675,000,000 feet. By January 1, 1920, when the mill began operating, this total had been reduced to 1,580,000,000 feet, and on January 1, 1925, the timber had been further reduced to 1,317,000,000 feet.

The Spaulding holdings are located near Olson and now consist of 450,000,000 feet of timber. For a number of years prior to 1931 this company had been engaged in cutting the timber and shipping the logs over the Valley & Siletz railroad to Independence, thence on a branch line of the Southern Pacific to Winona, a distance of 11.3 miles on the latter line, where the logs were placed in the Willamette river and floated down and across the river to the Spaulding mill at Salem. The total distance the logs were shipped by train was 46.9 miles. In describing this shipment, the commissioner states:

"Handling of saw-logs by the Valley & Siletz line from plaintiff's [the Spaulding Company's] shipping points at and near Olson station to Independence appears to be a very simple operation. At the shipping points both the empty and loaded cars are interchanged between the common carrier and plaintiff's private logging road by means of side tracks requiring very little, if any, extra switching service. At Independence the loads are pulled directly upon interchange track with Southern Pacific Company without extra switching service. From Olson to Independence the loads move over either a gradually descending grade or over practically level track."

In the progress of the hearing before the commissioner exhibits were introduced showing operating revenues and expenses of the Valley & Siletz railroad from and including 1918 to and including 1931, taken from the reports filed with the public service commis-

sion of Oregon. Operating revenues included freight, passenger, mail and express earnings, demurrage and two or three minor items. The amount received for freight service varied from $83,319 in 1919 (which is some $4,000 less than the preceding year) to $229,809 for 1926. The 1926 freight earnings did not vary greatly from the amount received in each of the next three years. In 1929, the last year of normal freight movement, the freight revenue was $222,227. The next year it dropped to $160,605, and in 1931 to $77,599.

The total railway operating revenue, including freight and passenger services, was $251,351 for 1929, which was exceeded in only one year, 1926, when it reached $259,800. In 1931 the entire revenue was $88,405.

In making its report to the federal and state regulatory bodies, the appellant included, beginning with the year 1925, an item designated "depreciation of way and structures", which was explained to be an entry covering amortization. This item increased from $36,536 for 1925 to $40,823 for 1931. With this allowance included, the grand total of operating expenses dropped from $194,881 in 1929 to $80,825.56 in 1932.

The net income of the railroad, figured on the basis above indicated, was given by this tabulation as $48,066 in 1929, while in 1932 the expenses exceeded the income by $65,135.21. The total operating revenue for the latter year was $20,008.44.

The year 1929 was adopted by both the complainant and the respondents in the hearing before the commissioner as a basis of ascertaining cost of transportation of freight over the Valley & Siletz line, because that year was representative of normal business on the line

and was the last year of such business. In 1929 the out-bound joint shipments were the following:

| Commodity | Number of cars | Total revenue |
|---|---|---|
| Lumber | 3,432 | $124,573.20 |
| Logs | 1,919 | 42,064.17 |
| Logs (hardwood) | 13 | 307.86 |
| Hog fuel | 1,250 | 18,219.79 |
| Pulpwood | 95 | 1,841.74 |
| Wood exclusive of oak | 183 | 3,449.83 |
| Wood (oak) | 16 | 250.40 |
| Miscellaneous (scrap iron, grain, etc.) | 9 | 738.17 |
| | | $191,445.16 |

Local shipments outbound, consisting of 501 cars, earned a revenue of $8,276.69. They comprised three cars of lumber, and the balance of wood, hog fuel, saw-dust and slabwood.

The inbound freight for that year, local and joint hauls, totaled 79 cars and earned an aggregate revenue of $4,821.87. Revenue for the same year derived from passenger service, including transportation of passengers, mail and express, amounted to $26,838.

There was a great deal of testimony taken at the hearing before the commissioner and many exhibits were introduced containing compilations of the cost per car-mile, average return per car-mile, expense of operation per car-mile, and so on. Many of these exhibits were for the purpose of facilitating comparison between rates on the joint haul here involved and those for similar distances on other lines.

The Spaulding Company attempted to prove by the testimony of Mr. Newell the direct or out-of-pocket cost of transporting logs from Olson to Winona. This witness went into detail regarding various items going to make up such direct cost, and his testimony was

based on the annual reports of the Valley & Siletz Railroad Company filed with the public service commission, supplemented by his own knowledge of general cost of operation, gained from practical experience and observation as a consultant. His conclusion was that the direct cost did not exceed $12.74 per car, and of this amount he apportioned $7.42 to the Valley & Siletz road and the balance of $5.32 to the Southern Pacific.

The appellant points out that this $12.74 does not include $1.50 per car rental for log cars paid by the Valley & Siletz railroad to the Southern Pacific. Mr. Newell explained that those cars were owned by one of the carriers sharing in the joint rate and should therefore be considered as capital investment, with the result that there was no justification for figuring their rental as part of the direct cost affecting the joint rate.

The further contention is made by this carrier that in apportioning some of the direct cost between its freight and passenger services Mr. Newell used as a basis for such allocation the ratio between revenues of the respective branches of service, and on that basis allotted 10.9 per cent of such expense to passenger service and 89.1 per cent to freight; whereas instead of this ratio, the appellant contends, the apportionment should be made on a car-mileage basis, which would make the division 4.7 per cent to passenger service and 95.3 to freight. In view of all the evidence on this subject, we are of the opinion that the basis used by Mr. Newell does not allocate to the passenger service too great a proportion of the undistributed operating expense of the railroad.

In this connection it might be observed that the passenger service on the Valley & Siletz railroad for

1929 amounted to 29,313 train miles, as against 24,441 train miles for freight; and that in view of this fact the apportionment of 10.9 per cent of some of the items of expense to passenger service is much less than the proportion of the respective items actually occasioned by, and fairly chargeable to, that service.

There was also some testimony by Mr. Newell to the effect that because of the reduced cost of labor and materials in 1933, when the hearing was held before the commissioner, the direct cost of hauling a carload of logs from Olson to Winona did not exceed $8.98. Probably the rate fixed by the commissioner in his first order, $18 per carload in fifteen-carload lots, reflected this decrease in wages and cost of materials. However, after additional testimony was taken in the circuit court showing that such decrease did not then exist, the commissioner raised the rate to $20 per carload, applicable to all shipments.

Neither the Valley & Siletz railroad nor the Southern Pacific attempted to prove by direct testimony the out-of-pocket cost of transporting logs in carload lots for this joint haul. They contented themselves with distributing, on the basis of car mileage, both the direct and the indirect costs of the Valley & Siletz railroad as shown by its published report for 1929. By this method of cost finding, no distinction is made between classes of freight handled.

In referring to a similar process of attempting to prove the cost of transporting a single commodity, the court in *Northern Pacific Railway Company v. Department of Public Works,* 268 U. S. 39 (69 L. Ed. 836, 45 S. Ct. 412), observed:

"The department's findings concerning operating costs rested largely upon deductions from data found in published reports of the carriers and in their exhibits

filed in this case. Instead of attempting to show by evidence, reasonably specific and direct, what the actual operating cost of this traffic was to the several carriers, the department created a composite figure representing the weighted average operating cost per 1,000 gross ton miles of all revenue freight carried on the four systems and made that figure a basis for estimating the operating cost of the log traffic in Washington. This was clearly erroneous.

"A precise issue was the cost on each railroad of transporting logs in carload lots in western Washington, the average haul on each system being not more than 32 miles. In using the above composite figure in the determination of this issue the department necessarily ignored, in the first place, the differences in the average unit cost on the several systems, and then the differences on each in the cost incident to the different classes of traffic and articles of merchandise, and to the widely varying conditions under which the transportation is conducted. In this unit cost figure no account is taken of the differences in unit cost dependent, among other things, upon differences in the length of haul, in the character of the commodity, in the configuration of the country, in the density of the traffic, in the daily loaded car movement, in the extent of the empty car movement, in the nature of the equipment employed, in the extent to which the equipment is used, and in the expenditures required for its maintenance. Main line and branch line freight, interstate and intrastate, carload and less than carload, are counted alike. The department's error was fundamental in its nature. The use of this factor in computing the operating costs of the log traffic vitiated the whole process of reasoning by which the department reached its conclusion."

There is ample evidence to sustain Mr. Newell's conclusion that $12.74 would cover the direct cost of hauling a carload of logs from Olson to Winona in the year 1929. The record does not disclose that the cost of operation was any greater in 1934, at the time of the hearing in the circuit court, than it was in 1929.

. Turning now to the question of indirect cost, we find that one of the items in dispute is the sum of $38,858 which the Valley & Siletz railroad credited for the year 1929 to amortization. This sum is accounted for by the company on the basis of an application which it filed with the interstate commerce commission in the early part of 1925, in which it requested permission to amortize its investment over a period of twenty-four years from January 1, 1921. This application stated that the railroad "was built for the purpose of bringing out to other transportation or markets the forest products from timber lands owned by" the Mitchell Company. It was further shown therein that all timber owned by that company would be removed in twenty-four years from January 1, 1921.

The investment in the Valley & Siletz road and equipment was represented to that commission as $1,169,856.62 on December 31, 1924, of which amount $87,128.09 covered "equipment which is already being depreciated". The application further stated that salvage at the end of the operation of the road would amount to $108,554.52, leaving a balance of $974,174.01 to be amortized. The bureau of accounts of the interstate commerce commission in authorizing amortization of this investment permitted the setting up of the sum of $235,750.09 for the period prior to January 1, 1925, and tentatively permitted the remainder, $738,-423.92, to be spread over the twenty-year period beginning on the date last mentioned.

It developed on the hearing before the public utilities commissioner that there was a total of 4,000,-000,000 feet of timber tributary to the Valley & Siletz railroad, and it was contended by the complainant there that the period of amortization would more properly be forty years than the shorter period authorized by the

bureau of accounts of the interstate commerce commission, which was based solely on the timber holdings of the Mitchell Company. Figuring this extended period of forty years for amortization, an exhibit was introduced by the complainant showing that a proper charge for this purpose for the year 1929 would be the sum of $21,502, instead of the $38,858 set up by the Valley & Siletz railroad. Referable to the amount of timber available for transportation in the area tributary to this railroad, the record discloses that approximately $22\frac{1}{2}$ cents per thousand feet of standing timber in the tributary area would be sufficient to set aside for amortization of the road.

During the period that the Valley & Siletz railroad has been in operation it has turned over to its stockholders the sum of $360,063 as repayment of their investment, which amount should be deducted from the amount invested by the railroad company in its property; and when this deduction is made there is left a valuation of $905,425 as of the year 1931. The valuation for 1929, after deducting the amount repaid to that time, was $924,319.

In 1929 the Valley & Siletz Railroad Company after charging off depreciation and all other expenses incidental to its railroad operation, including a sufficient allowance for amortization, realized a fair return on the value of its property for rate-making purposes. The same is true of a number of years' operation prior to 1929. Figuring the amount to be allowed for amortization extending over a period of forty years from 1925, we find the net income, computed by this method, was as follows: 1926, $80,109; 1927, $61,950; 1928, $71,009; 1929, $65,421. These revenues, based on various valuations for the years covered, are equal to rates of

return as follows: 7.51 per cent, 6.01 per cent, 7.51 per cent, and 7.02 per cent, respectively, for those years.

According to the report of the business done by the Valley & Siletz railroad during the year 1929, the gross revenue for logs hauled by that railroad amounted to $42,064.17, the only log movement being from Olson to Independence, so far as that company's line was concerned. If we were to apply to log shipments for that year the rate prescribed by the utilities commissioner, figured at one-third less than the rate then in effect (that is, $20 instead of $30.77), the company would have earned $14,021 less than the amount it actually did earn. It has already been pointed out that the net earnings of the railroad for the year 1929, on the valuation of its property for rate-making purposes, amounted to a return of 7.02 per cent.

The difference between the amount allowed by the interstate commerce commission, to wit, 5.75 per cent, and that actually earned as above shown, on a valuation for the year 1929 of $924,319 for rate-making purposes, amounts to $12,273. Had the $20 rate been in effect in 1929 and the revenue from the joint haul from Olson to Winona been distributed to the two carriers on the same basis, the Valley & Siletz railroad would in that year have earned only $1,748 less than 5.75 per cent of the value of its property on which it was entitled to a return. Surely a discrepancy as small as this could not be called a confiscation of the company's property. But we find that in the figures above used, showing the net return to the Valley & Siletz railroad, there were included in the expenses for the year 1929 depreciation accounts of $1,680 on locomotives and $3,746 on cars, although the amount invested in this equipment had prior thereto been fully covered by allowances for depreciation. In addition thereto, the maintenance of

way and structure expenses, amounting to more than $64,000, were termed by one of the witnesses excessive, and even Mr. Watson, superintendent of the Valley & Siletz railroad, testified: "Well, our 1929 maintenance there took in quite a good deal of extra work. For instance, we laid five miles of rail, changed from fifty-six to eighty-five, which is quite an expense." A considerable part of this latter cost should be charged to capital investment. If the deficiency of $1,748 above referred to were to be considered material, it could easily be absorbed by the excessive allowances claimed by the Valley & Siletz railroad in the respects here noted.

There was testimony to the effect that, in the event a reasonable rate could be established on logs from Olson to Winona, the Spaulding Company would ship from 4,500 to 5,400 cars per year. If we subtract the $12.74 actual cost per car found by Mr. Newell from the $30.77 which the railroads, the Valley & Siletz and the Southern Pacific, have been receiving on carload shipments of logs from Olson to Winona, the remaining $18.03 may be considered as applicable to indirect costs such as upkeep of the railroad, return on investment, and so on. Figuring this $18.03 per car for the year 1929, when 1921 cars (sometimes referred to as 1,919 cars) of logs were shipped from Olson to Winona, we have a total of $34,635.63 over and above the direct cost of operation. If we take the increased traffic which would bring the total shipments up to 4,500 cars per annum, at $7.26 per car, the difference between the $20 rate fixed by the commissioner and the $12.74 above referred to, we have a total of $32,670 over and above the out-of-pocket cost. If we use the larger estimate of 5,400 cars, we have a total annual

revenue of $39,304 to the railroad companies in excess of the actual cost of operation.

Included in the item of $34,635.63 realized by the carriers on the 1,921 cars of logs shipped in 1929, over and above the direct cost of such shipments, there might be figured the amortization of the Valley & Siletz railroad at $1.77 per car, amounting to $3,400.17, which, when deducted from the larger amount, leaves $31,235.46. If a similar procedure be followed with relation to the estimate of 4,500 cars at the lower rate fixed by the commissioner, the resulting $32,670 would be reduced to $24,705. On a basis of 5,400 estimated cars, net receipts of $39,304 at the new rate, with deduction for amortization, would leave $29,746 over and above the direct cost of operation.

Whatever additional expense there would be in connection with the maintenance of roadbed, tracks, equipment and cars, due to the increase in tonnage, would be absorbed in the $12.74 per car. In other words, such expense in connection with the maintenance of the railroad as may not be attributed to the direct cost of operation is incidental, and is not increased by an increase in traffic. The greater the traffic, the less per car would be this continuing or indirect cost, if it were to be allocated to every car hauled. By increasing the amount of shipments from 1,921 cars for the year 1929, the railroad would receive, after deduction for amortization, a revenue of $1,490 less on a possible 5,400 cars shipped at the rate of $20 per car than it received in 1929 for actual shipments at its then prevailing rate of $3.90 per thousand feet, board measure. It would, however, receive on this larger estimated movement of logs $6,157 more to be applied to amortization than available at $1.77 per car on the actual shipments of the year 1929.

There has been no movement of logs whatever over the Valley & Siletz railroad since some time early in 1931. In the event that the rate established by the commissioner should result in shipment by the Spaulding Company of 4,500 to 5,400 cars of logs annually, at the rate of 18 cars per day, the railroads would receive something like $130 per day above their out-of-pocket cost of operation. This, of course, is to figure the direct cost at $12.74 and the newly-established rate at $20 per car.

There was admitted in evidence, without objection, a copy of the opinion and order of the interstate commerce commission (reported in 180 I. C. C. 28) on an application made by the Oregon Electric Company in 1930, to purchase the Valley & Siletz Railroad Company at a valuation of $2,000,000. This application was resisted by the Southern Pacific Company. The request of the Oregon Electric Company was denied, but, in passing upon the earnings of the Valley & Siletz railroad, the interstate commerce commission observed: "Under present conditions the Valley & Siletz is earning a net income of approximately $87,000 per annum, which is sufficient to provide a 5¾ per cent return on $1,500,000 and provide a sinking fund. The earnings of the Southern Pacific amount to $167,000 over its out-of-pocket cost for the part of the service which it performs in connection with the competitive traffic to and from the Valley & Siletz." This statement is significant, in view of the fact that many of the exhibits introduced in evidence were based on reports filed with the interstate commerce commission under its uniform accounting rules, and that commission is probably in a much better position to analyze and apply the items covered by such reports than is a court of law.

Before leaving the subject of the interstate commerce commission's above report, it might be well to refer to the reasons why the Southern Pacific railroad was opposing the application of the Oregon Electric Company. These reasons are stated as follows:

"The Southern Pacific opposes the application of the Oregon Electric on the grounds that the Valley & Siletz connects only with the Southern Pacific and is in fact an auxiliary of that system; that the Valley & Siletz is assigned to the Southern Pacific in *Consolidation of Railroads,* 159 I. C. C. 522, and, in accordance with that plan, it should be acquired by the Southern Pacific in order to preserve and maintain existing routes and channels of trade; that the Southern Pacific has established a line of transcontinental rates placing the Valley & Siletz on the same basis as its own branch lines; that the purchase of the Valley & Siletz has been contemplated for some time and an attempt to open negotiations therefor was made in the fall of 1930, without encouragement from the officers of the Valley & Siletz, and that the traffic from the Valley & Siletz is essential to bolster up the earnings of the Southern Pacific lines in Oregon, which lines represent a large investment on which the return has been low due to light traffic."

The appellant would apportion the indirect cost of its operation on the basis of carload shipments or car-mile haul. To a carload of logs consisting of approximately 8,000 feet, board measure, and valued at $40 to $50, it would assign the same amount as to a carload of lumber of 25,000 feet, having a value of at least $250 and in many instances in excess of $500. One of the arguments it advances for such computation is that both logs and lumber are forest products and hence are not commodities of different classes. The very statement of this last proposition refutes the appellant's

contention. An article in its raw state is not the same commodity as the finished product.

■ The carrier can not complain of a violation of its constitutional rights, if it is compelled to make a rate for some particular service which will not equal a proportionate share of the entire expense of the road: *Minneapolis & St. Louis R. Co. v. Minnesota,* 186 U. S. 257 (46 L. Ed. 1151, 22 S. Ct. 900); *Atchison, Topeka & Santa Fe Railway Company v. United States,* 203 Fed. 56 (affirmed, 231 U. S. 736 (58 L. Ed. 460, 34 S. Ct. 316)).

■ The commissioner has a wide range of discretion in the exercise of the power to prescribe reasonable charges, and he is not bound to fix uniform rates for all commodities or to secure the same percentage of profit on every sort of business. "There are many factors to be considered,—differences in the articles transported, the care required, the risk assumed, the value of the service, and it is obviously important that there should be reasonable adjustments and classifications. * * * With respect to particular rates, it is recognized that there is a wide field of legislative discretion, permitting variety and classification, and hence the mere details of what appears to be a reasonable scheme of rates, or a tariff or schedule affording substantial compensation, are not subject to judicial review": *Northern Pacific Railway Company v. North Dakota,* 236 U. S. 585 (59 L. Ed. 735, 35 S. Ct. 429, Ann. Cas. 1916A, 1).

In *Dayton-Goose Creek Railway Company v. United States,* 263 U. S. 456 (86 L. Ed. 388, 44 S. Ct. 169, 33 A. L. R. 472), Mr. Chief Justice Taft observed:

"To regulate in the sense intended is to foster, protect and control the commerce with appropriate regard to the welfare of those who are immediately concerned,

as well as the public at large, and to promote its growth and insure its safety. The Daniel Ball, 10 Wall. 557, 564; County of Mobile v. Kimball, 102 U. S. 691, 696, 697; California v. Pacific R. R. Co., 127 U. S. 1, 39; Wilson v. Shaw, 204 U. S. 24, 33; Second Employers' Liability Cases, 223 U. S. 1, 47; Luxton v. North River Bridge Co., 153 U. S. 525, 529. * * *

"It should be noted that, in reaching a conclusion, upon this first proposition, we are only considering the general level of rates and their direct bearing upon the net return of the entire group. The statute does not require that the net return from all the rates shall affect the reasonableness of a particular rate or a class of rates. In such an inquiry, the commission may have regard to the service done, its intrinsic cost, or a comparison of it with other rates, and need not consider the total net return at all."

Economic conditions have always exerted a definite influence upon the rate-making processes of both carriers and regulatory bodies. If economic facts were to be disregarded, there would be little occasion for the classification of freight. As was said in *Ann Arbor Railroad Company v. United States,* 281 U. S. 658 (74 L. Ed. 1098, 50 S. Ct. 444), with reference to a joint resolution of Congress:

"The resolution is in three paragraphs. The first declares it to be a true policy in rate making that the conditions which at any given time prevail in the several industries 'should be considered' in so far as it is 'legally possible' to do so, to the end that commodities may move freely. This policy is not new. In rate making under existing laws it has been recognized that conditions in a particular industry may and should be considered along with other factors in fixing rates for that industry and in determining their reasonableness, and it also has been recognized that so far as can be done with due regard for the interests affected rates should be such as will permit the commodities to which they relate to move freely in the channels of commerce."

Something was said at the hearing before the commissioner concerning the necessity of an outlay by the Valley & Siletz Railroad Company of approximately $32,000 for repairing the roadbed before log transportation could be resumed. Mr. Watson, superintendent of this railroad, testified that this expenditure would be required if it should be found necessary to move "even a few cars of lumber". During the circuit court hearing this same witness testified that the railroad had resumed lumber shipments and was hauling as many as five cars in a train. Apparently, then, this expenditure has already been made.

We are here dealing with a situation in which, at the present time, there is no shipping of logs. This may be due to financial conditions or to excessive rates. If the lower rates prescribed by the commissioner should stimulate log shipments and that traffic should reach the volume contemplated, it would then appear that the carriers were benefited. If no shipments should result, there would be no injury.

■ The appellant, in its brief, states:

"The function of the court in this case is not to substitute its judgment for that of the regulatory authority as to what a reasonable rate under the circumstances should be but to determine whether or not the state regulatory authority has under the principles of law submitted in such cases, under the evidence adduced, established a rate which takes the property of the defendant without due process of law as defined in the cases referred to, and if such is the case, it is then the duty to set aside and annul the order of the state regulatory authority as confiscatory.

\*    \*    \*    \*    \*

"We have refrained from discussing the other testimony and exhibits of the various witnesses before the commission [commissioner] for the reason that the

function of the court is not to substitute its judgment for that of the commission [commissioner] in determining the reasonableness of the rate to be applied but its function is limited to the determination as to whether or not the rate established by the commission [commissioner] is confiscatory.''

The correctness of the foregoing views expressed by appellant renders unnecessary a lengthy discussion concerning the force and effect of the commissioner's order prescribing reasonable rates. See, however, in this connection: *Oregon-Washington Railroad & Navigation Company v. Public Service Commission,* 120 Or. 517 (252 P. 955); *Interstate Commerce Commission v. Union Pacific Railroad,* 222 U. S. 541 (56 L. Ed. 308, 32 S. Ct. 108); and *Chicago, Rock Island & Pacific Railway Company v. United States,* 274 U. S. 29 (71 L. Ed. 911, 47 S. Ct. 486).

In conclusion, it is well to give careful attention to the language of this court in *Hammond Lumber Company v. Public Service Commission,* 96 Or. 595 (189 P. 639, 9 A. L. R. 1223):

''The plaintiffs have not maintained the burden of proof of showing that the commission exceeded its powers or acted in violation of any principle of law. Moreover, in the very nature of things, the factors involved in an inquiry of this kind are so many and so variable that it is impossible to fix rates that will be mathematically correct or exactly applicable to all the new conditions that may arise even in the immediate future. In practice, it is reasonable and just in most instances to give the rates in question a fair trial under actual operation. This is the teaching of Darnell v. Edwards, 244 U. S. 564 (61 L. Ed. 1317, 37 Sup. Ct. Rep. 701), a leading case cited by the plaintiffs: See, also, Lincoln G. & E. Co. v. Lincoln, 250 U. S. 256 (63 L. Ed. 968, 39 Sup. Ct. Rep. 454). Besides all this, the establishment of a given rate sheet is not absolutely final and conclusive for all time; for new conditions may

arise tomorrow which will make unreasonable, one way or the other, a rate which today is just and fair. The whole matter is continually under the scrutiny of the commission, in the exercise of a flexible administrative authority, and can be reopened at any time, either on its own motion or on the petition of interested parties: Section 6906, L. O. L."

■ The appellant has not shown by its complaint or by the evidence in the case that the rates prescribed by the public utilities commissioner are confiscatory. The decree appealed from will therefore be affirmed.

RAND, J., not participating.

———

ROSSMAN, J. (dissenting). This opinion, excepting its first eleven paragraphs, was written before the other members of the court had expressed their attitude. It now develops that this opinion represents only the view of its author. I avail myself of the privilege of dissenting, and, as an expression of my views, employ the opinion previously prepared. It is somewhat lengthy as a dissenting opinion, but, as already indicated, was prepared for a different purpose. Before getting to the opinion previously prepared, I desire to take note of some statements contained in the majority opinion.

First, the majority treats as findings the memorandum prepared by the commissioner in which he summarily states that the carrier-made rate "in so far as same exceeds the rates and charges hereinafter prescribed, is unjust and unreasonable" and in which he also states that the rate which he is about to prescribe is "just, reasonable and lawful". The majority regards the quoted words as findings. It seems evident that the commissioner did not employ those statements

as findings. It is manifest that they are purely conclusions of law. If the statutory requirement of findings is so easily satisfied, then the requirement is useless. Such "findings" are of no service to the courts and afford no protection to the carriers against the arbitrary exercise of administrative power. Every commissioner, however unreasonable he may be, will always be willing to make such "findings". The majority does not mention 1931 Session Laws, ch. 103, § 6, nor 1933 Session Laws, ch. 441, § 36, which more clearly contemplate that the findings of the commissioner should state the facts upon which he predicates his orders. These enactments receive attention in later parts of this decision.

The majority disparages the carrier's contentions concerning the probabilities of overloading if carload rates are substituted for quantity rates. The testimony in this regard came largely from witnesses called by the Spaulding Company and indicates that where carload rates are in effect loads of 10,000 feet are common. The same witnesses testified that frequently cars carry as high as 12,000 feet. The uncontradicted testimony of the carriers indicates that a recent order of the Washington Service Commission putting into effect carload rates in that state has been followed with overloading.

The majority presume that because the Southern Pacific Company has not instituted a suit to set aside the commissioner's order his rate is satisfactory to that carrier. However, the business originates upon the plaintiff's line, and whenever the commissioner makes an apportionment of the $20 rate between the two carriers he will have to apportion to the Valley & Siletz only its part of the $20 rate and not its part of what the rate should have been. Joint rates, in a measure, con-

vert the carriers into partners for the purposes of the joint haul, and we know of no reason why each carrier should not be permitted to contest every item of cost which enters into the commission-made joint rate. It is certain that if the commission-made rate is too low each carrier will suffer a part of the consequences. We notice that in the circuit court the plaintiff's cause was supported, in part, by the attorneys and employees of the Southern Pacific Company.

The majority states that the plaintiff's pleadings are insufficient to present the issue of confiscation. No party to this litigation has voiced such an objection. The trial proceeded without mention of the plaintiff's pleadings. It has never been the policy of this court to interpose technical objections so as to defeat a person who desires to avail himself of a substantial constitutional right.

The decision of the majority states: "Passenger service of the Valley & Siletz railroad for 1929 amounted to 29,313 train miles as against 24,441 train miles for freight." and then states that "In view of this fact, the apportionment of 10.9 per cent of some of the items of expense to passenger service" is just. The uncontradicted evidence, however, indicates that only 349 miles were run by passenger trains on the Valley & Siletz railroad. Those trains consisted of two passenger cars operated on two or three occasions during the fishing season. All of the rest of the 29,313 passenger miles were run by a small gasoline speedster operated by one man. Mr. Newell, a Spaulding witness, described the speedster which he saw as "a little gasoline car capable of carrying 8 or 10 passengers". Surely it was not a passenger train.

Next, the majority opinion states: "Neither the Valley & Siletz railroad nor the Southern Pacific at-

tempted to prove by direct testimony the out-of-pocket cost of transporting logs in carload lots for this joint haul. * * * There is ample evidence to sustain Mr. Newell's conclusion that $12.74 would cover the direct cost of hauling a carload of logs from Olson to Winona in the year 1929.'' These two statements are clearly contradictory. If there is no testimony showing the out-of-pocket cost of transporting logs, then there can not be in the record ''ample evidence'' in support of Mr. Newell's conclusion. However, the Valley & Siletz produced what appears to be all of the available evidence concerning the cost of transporting logs. The respondents do not mention any missing fact, nor does the prevailing decision. The Valley & Siletz showed, for instance, the amount of its invested capital, showed in detail the cost of its operations, the number of trains which it operated and the kind and quantity of freight which it hauled. It showed where each car originated, the distance it traveled upon the plaintiff's line, the commodity it contained, the weight of the load and the charge paid for hauling it. Its tariff sheet is in evidence. We know the grades over which each car passed, the curves, etc. We know the number of men that constituted a train crew and the number of men employed in maintenance work. We know the number of inbound and outbound cars. The evidence discloses the number of available shippers and the character of freight they offer. The record discloses an abundance of other facts. Three or four of the witnesses used this detailed data as the basis of lengthy compilations which were received in evidence. None of the witnesses claimed that anything was missing to enable them to carry on their calculations even to the fraction of a cent. It is impossible to conceive what further evidence the Valley & Siletz could have

produced for the enlightenment of the commissioner or of the court. It is true that the Southern Pacific Company submitted scant data. However, it was not required, under the circumstances, to produce any evidence. Before the commissioner can disturb a carrier-made rate some one must make a prima facie showing that it is unreasonable. In the present instance, virtually no proof concerning the branch line of the Southern Pacific over which the Spaulding logs were hauled was produced. For instance, we do not know where this branch line begins nor where it terminates. We know nothing concerning its length. No witness mentioned whether it is a double-track line or otherwise. We do not know how many trains are operated upon it. No one testified whether passenger service is afforded by this branch line. The record is silent as to whether or not this line is protected by block signal safety devices. The amount of taxes which the Southern Pacific Company pays upon this branch line was not disclosed. Likewise, the amount that carrier incurs for the maintenance of its right of way, the upkeep of its stations, and other similar items are wholly missing. We do not know what curves and grades are encountered upon the line. If there are trestles over which the trains pass, no witness mentioned them. There has been no showing of the kind of commodities transported over the line and the amount which each pays. We do not know the direction in which the freight moves nor the destinations to which the commodities are bound. We add that the record is as silent concerning the eleven-mile stretch involved in this proceeding as it is in regard to all other parts of the branch line. Without mentioning these missing facts further, we conclude by stating that the only effort which the Spaulding Company made to prove the cost of hauling the logs for eleven or more

miles upon the Southern Pacific branch line was the so-called direct costs. This proof will be considered later. It suffices for present purposes to state that, since the Spaulding Company made no effort to prove the above-mentioned items which must be known before the cost of the haul can be ascertained, the carriers were not required to produce evidence. In rate-making, as in all litigation, no one is required to disprove a contention which has not been supported by proof.

Next, the prevailing opinion states: "The record does not disclose that the cost of operation was any greater in 1934 at the time of the hearing in the circuit court than it was in 1929." The testimony was taken in the circuit court March 8, 1934, and, manifestly, since only two months of that year had passed there could be but little data available concerning 1934 costs. Moreover, common experience tells us that in January and February logging operations are frequently suspended.

Next, the majority states that in 1926, 1927, 1928 and 1929 the plaintiff made a profit of 6.01 per cent to 7.51 per cent. They, however, ignore the deficits incurred in four years and the meager profits earned in two years.

Next, note is taken of the fact that the income of the Valley & Siletz from log shipments in 1929 was $42,064.17. A statement is then made that if the $20 rate had been in effect in 1929 the carrier would have earned 5.75 per cent on its value less $1,748. This circumstance causes the majority to declare: "Surely a discrepancy as small as that can not be called a confiscation of the company's property." In other words, the majority is apparently not concerned with the expenses incurred by the carrier in hauling logs. If the carrier, regardless of the cost of rendering log-haul service, earns enough from its other business to have

a profit at the end of the year, the majority believes that the rate is reasonable and not confiscatory. In other words, a guest of an inn which is operating at a profit can insist upon accommodations at less than cost; or the State, upon being charged with confiscation of a portion of a farmer's property, can reply: ''We have not taken all, and, therefore, since we have left some, you have no cause for complaint.'' Time after time the courts, in rate cases, have declared that a carrier can not be compelled to haul a commodity at less than cost merely because the rest of its business yields a net profit. One of these decisions, a log-rate case, will be mentioned later.

Next, the majority refer to the Spaulding Company's hope to bring in from its logging camp 4,500 to 5,400 carloads of logs annually in the event a sufficiently low rate is established, and then, after deducting from the total amount of freight charges paid by these cars (at $20 a car) the direct cost of their movement as calculated by Mr. Newell, and an amortization charge of $1.77 per car, show that there will be something left. No effort whatever is made to show that the sum left will be sufficient to discharge the indirect costs of hauling the logs, but the majority rest content with the observation that there will be something left. Apparently the majority entertain the belief that a rate, not sufficiently high to earn direct expenses plus indirect expenses and plus a return upon the investment, is, nevertheless, a non-confiscatory rate if something is left after the direct charges have been paid. No authority is cited in support of such novel rate-making. As is self-evident, the carrier, besides discharging its direct expenses, must also discharge its indirect expenses. In the present instance these indirect expenses consist of taxes, maintenance of right

of way, administrative expenses, etc. In the portion of this opinion previously prepared all of these expenses are itemized and the method of their apportionment between lumber, passengers, hog fuel and logs is set forth. As a result of the calculations there set forth $7.42 of the Valley & Siletz indirect expenses should be apportioned to each carload of logs. Therefore, 5,400 cars should bear $40,068 of the indirect expenses. The plaintiff owned no cars and was required to pay the Southern Pacific Company $1.50 per car rental. Since nothing is allowed the latter carrier for its indirect expenses and no return upon its investment, rental is a proper item of indirect cost. Fifty-four hundred cars would, therefore, have to pay $8,100 rental; $40,068 plus $8,100 total $48,168. The majority state that if the carriers hauled 5,400 cars at a rate of $20 per car they would have $31,235.46 with which to discharge their indirect expenses. It will be observed that this $31,-235.46 will be insufficient; in fact, the $48,168 just mentioned includes nothing for the Southern Pacific Company's indirect expenses and includes no profit for either carrier. The prevailing opinion, without so stating directly, intimates that the reason for its belief that an inadequate rate is a just rate is because the carrier would have to maintain its right of way, pay its taxes, etc., whether it hauled the Spaulding logs or not. In other words, a prospective passenger who discovers that a train, just before its departure, is half empty can insist upon being carried for only a few cents by arguing, "Well, you would have to run the train anyway." Or a guest who arrives at a hotel in the late evening and finds that some rooms, in all likelihood, will remain unoccupied through the night can tender the amount necessary to launder the linen in the room he proposes to occupy (the direct cost) plus

a few cents extra, and thereby demand that he be accommodated. Of course, no court has ever before embraced such a method of rate-making. As the majority state, the plaintiff received in 1929 a total freight revenue of $222,227. Fifty-four hundred cars of logs would constitute 72 per cent of its 1929 total (7,497 cars) and at a rate of $20 per car, if we apportion the rate between the two carriers on the same basis as the $30.77 rate was apportioned ($21.92 to the plaintiff and $8.75 to the Southern Pacific), would yield the plaintiff $76,734. Thus, after doing 72 per cent of its 1929 total business, it would receive only 34 per cent of its 1929 revenue.

The following statement contained in the decision of the majority, and which we have quoted already, demands further attention: ''There is ample evidence to sustain Mr. Newell's conclusion that $12.74 would cover the direct cost of hauling a carload of logs from Olson to Winona in the year 1929.'' Mr. Newell's computations receive extensive analysis in the opinion previously prepared by myself and which is made a part of this dissenting opinion. For present purposes it is sufficient to state that Mr. Newell himself admitted that in distributing the costs of operation he counted work cars used by the section crews which produce no revenue and that, therefore, the $12.74 total was too low to the extent of about four cents. He also admitted that he had underestimated by several hundred dollars the fuel charges, and conceded that two or three other items possibly needed revision. Since he was wholly unaware of the Southern Pacific Company's expenses upon the branch line involved in this proceeding, and had made no effort to obtain the figures, he resorted to estimates. It then developed that he had allowed that carrier for locomotive maintenance a sum per mile which was substantially less than the experience of any

carrier; in fact, the sum he allowed was much less than the Southern Pacific Company's experience in Oregon had shown possible. Thus, the above conclusion of the majority is not supported by the record. The prevailing opinion makes no effort whatever to show that the $20 rate will yield a profit. It states that the reduced rate will probably develop more traffic. If that is the justification for the rate, then a $10 rate would be even more justifiable. But, to survive, the carrier needs profit, or, at least, its operating expenses.

Without analyzing any further the decision of the majority, we now append to these observations the opinion previously mentioned.

The appellant (the railroad) contends that the order of the commissioner of public utilities is invalid because:

(1) The commissioner made no findings of fact whatever;

(2) the commissioner substituted a carload rate for the existing thousand-foot rate without, so the appellant argues, adequate pleadings;

(3) the circuit court judge, so the appellant avers, failed to examine the evidence introduced before the commissioner; and

(4) the rate prescribed by the commissioner and attacked in this suit is confiscatory.

The latter contention is basic. We shall now proceed with a consideration of it.

The first step to be taken is to determine what effect, if any, should be attached to the commissioner's finding. He entered no findings of fact, but the defendants (one of whom is the commissioner) contend: (a) the order of the commissioner and the rates therein prescribed are prima facie lawful and reasonable; (b) before the commissioner's order can be set aside the

plaintiff must assume the burden of proof and show by clear and satisfactory evidence that the order is illegal; and (c) rate-making is an administrative function when done by the public utility commissioner, and the court can not substitute its judgment for that of the commissioner. The fourteenth amendment to the Federal Constitution provides:

"* * * nor shall any State deprive any person of life, liberty or property without due process of law."

Article I, § 18, Constitution of Oregon, provides:

"Property shall not be taken for public use, nor the particular services of any man be demanded without just compensation."

Article VII, § 1, Constitution of Oregon, provides:

"The judicial power of the State shall be vested in one supreme court and in such other courts as may from time to time be created by law."

Nineteen Thirty-one Session Laws, chapter 103, section 1, abolished the office of public service commission and created the office of public utilities commissioner. The same section provides that the commissioner shall be appointed to his office by the governor and that his term shall be four years. Section 2 of the act gives the governor virtually unrestrained power of removal over the commissioner. We quote from the section:

"Such power of removal shall be absolute, and there shall be no right of review of the same in any court whatsoever."

The section also provides that the commissioner shall not be pecuniarily interested in any public utility "and if any such commissioner is or does become inter-

ested, his office shall ipso facto become vacant.'' Section 5 provides:

"In addition to the powers and duties now or hereafter transmitted to or vested in the commissioner, it shall be his duty to represent the patrons, users of the service, and consumers of the product of any public utility and the public generally in all controversies respecting rates, charges, valuations, service and all matters of which he has jurisdiction, and in respect thereof it shall be his duty to make use of the jurisdiction and powers of his office to protect said patrons, users and consumers and the public generally from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates.''

Referring to the rates charged by public utilities, Section 6 provides:

"The commissioner may on his own motion summarily investigate any such matter with or without notice.''

Continuing, it provides that if his summary investigation causes him to believe that the utility is charging unfair rates or is committing any other wrong "he shall furnish such public utility interested a statement notifying it of the matters under investigation, which statement shall be accompanied by a notice fixing the time and place for hearing upon such matters''. At the designated time the hearing shall proceed "as though complaint had been filed with the commissioner relative thereto, and the same order or orders may be made in reference thereto as if such investigation had been made on complaint; provided that the commissioner may, in his discretion, after he has made any such investigation on his motion, but after notice of hearing as above specified, make such findings and orders as he deems justified or required by the results of

such investigation, which findings and orders shall have the same legal force and effect as any other finding or order of the commissioner''. Other sections of our public utility statute empower the commissioner to prescribe schedules of rates whenever he deems an investigated rate to be unfair. Section 62-135, Oregon Code 1930, provides:

"All rates, fares, charges, classifications and joint rates fixed by the commission shall be in force and shall be prima facie lawful and all regulations, practices and service prescribed by the commission shall be in force and shall be prima facie reasonable until finally found otherwise in an action brought for that purpose. * * *"

Section 62-136 provides that any person affected by any order of the commission may maintain a suit in the circuit court for Marion county against the commission to vacate the order. We now quote from the section:

"In all trials under this section, and sections 62-137, 62-138, and 62-140 the burden of proof shall be upon the plaintiff to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable as the case may be."

Section 62-138 provides that if upon the trial of the suit evidence be introduced by the plaintiff which is found by the court to be different from that offered upon the hearing before the commissioner or additional thereto the court, before rendering judgment, unless the parties stipulate otherwise, shall transmit a copy of the evidence to the commissioner and shall stay further proceedings for fifteen days. Upon receipt of the transcript the commissioner may alter his order. The court, after the fifteen-day period has expired, may enter such decree as it deems advisable.

December 13, 1932, the Charles K. Spaulding Logging Company (one of the two defendants in our

present suit) filed with the commissioner of public utilities a complaint charging that the rates exacted by the plaintiff in this suit upon log shipments from Olson to Winona were unreasonable. Olson is a point on the plaintiff's railroad. Winona is a point on the Southern Pacific Company's line about 46 miles from Olson. Plaintiff's railroad extends from Valsetz to Independence, a distance of 40.6 miles. About 35 miles from Independence is the station called Olson. At Independence plaintiff's line connects with a branch line of the Southern Pacific Company. Eleven and three-tenths miles from Independence on the Southern Pacific Company's line is a station or log dump called Winona. The aforementioned complaint of the Spaulding Company was against both the Valley & Siletz Railroad and the Southern Pacific Company. These carriers filed answers with the commissioner and thereafter a hearing was held. Still later an order was entered granting a very substantial reduction in the contested rate. Then the present suit was filed and, as we have seen, the party plaintiff is the Valley & Siletz Railroad, while the defendants are the Spaulding Company and the public utilities commissioner. The relief sought is a decree vacating the commissioner's order. The reasons assigned are that the rates prescribed by the commissioner "are unreasonable, unlawful and confiscatory, and in violation of the Constitution of the United States and the statutes of Oregon". After answers had been filed, testimony was taken. A transcript of the latter, at the close of the trial, was transmitted to the commissioner who later revised his order. He fixed a rate of $20 for hauling a carload of logs from Olson to Winona. The rate prescribed by the carriers was $3.90 per thousand feet. In 1929 the average load was 7,890 feet, and, therefore, the average

car in that year yielded a revenue of $30.77. The decree of the circuit court was preceded by an entry of findings of fact favorable to the commissioner's order and denied to the plaintiff the relief it sought.

We proceed now with a consideration of the defendants' contentions that (1) the order under attack is prima facie valid; (2) the burden of proof in this suit upon all issues rests upon the plaintiff; (3) plaintiff must substantiate its averments with clear and satisfactory evidence; and (4) this court can not substitute its judgment for that of the commissioner upon any issue of fact. In support of these contentions, the defendants cite §§ 62-135 and 62-136, Oregon Code 1930; *Hammond Lumber Co. v. Public Service Commission,* 96 Or. 595 (189 P. 639, 9 A. L. R. 1223); *Oregon-Washington R. & N. Co. v. Corey,* 120 Or. 517 (252 P. 955); *Grand Trunk Ry. v. Michigan Ry. Comm.,* 231 U. S. 457 (58 L. Ed. 310, 34 S. Ct. 152); *Interstate Commerce Comm. v. Louisville & Nashville R. R. Co.,* 227 U. S. 88 (57 L. Ed. 431, 33 S. Ct. 185); *City of Knoxville v. Knoxville Water Co.,* 212 U. S. 1 (53 L. Ed. 371, 29 S. Ct. 148); and *San Diego Land Co. v. National City,* 174 U. S. 739 (43 L. Ed. 1154, 19 S. Ct. 804). We have already quoted the parts of §§ 62-135 and 62-136 upon which the defendants rely; but add that these sections of our code as parts of 1907 Session Laws, chapter 53, were adopted prior to the enactment of 1931 Session Laws, chapter 103, which, as we have seen, requires the commissioner to become the partisan of the utility's customers.

In *Hammond Lumber Co. v. Public Service Comm.,* supra, the plaintiff did not present any issue of lack of due process of law. That suit was instituted by a shipper who claimed that the rate established by the commission was unreasonable because the commission,

in determining the cost of the haul, included an annual sum for the amortization of the value of the railroad. Our decision sustained the rate.

In *Oregon-Washington R. & N. Co. v. Corey,* supra, the suit was instituted by the carrier against the public service commission to set aside commission-made rates, and was based upon contentions that the rates were unreasonably low and discriminatory. The order prescribing the rates was preceded by the entry of findings of fact. The decision, after quoting the sections of our laws which are now §§ 62-135 and 62-136, Oregon Code 1930, stated:

"The burden of proof that an order of the commission, when supported by substantial evidence, is unlawful, unreasonable or unjustly discriminatory, rests upon the plaintiff in the suit and not upon the commission. Hence, a carrier attacking an intrastate rate established by an order of the commission must show 'by clear and satisfactory evidence' that the order establishing the rate is not supported by substantial evidence, or that for some other reason it is unlawful, unreasonable or unjustly discriminatory, or else the order must stand. * * * Hence, under these decisions, unless it appears that the findings are not supported by substantial evidence, or that there has been some irregularity in the proceedings, or some error upon the part of the commission in its application of the rules of law, the findings and order of the commission upon the question of whether the old rates were unreasonable or unjustly discriminatory, as well as upon the question of whether the commission-made rate is reasonable and not discriminatory, are conclusive upon the courts. * * * We have no power to pass upon this conflict of testimony, nor to determine the weight of the evidence in its bearing on the reasonableness of the rate. These questions by law are questions for the commission and not for the courts. There was substantial evidence to support the findings of the commission, and there is nothing in the record show-

ing any irregularity in the proceedings before the commission, or any error in the application by the commission of the rules of law."

We come now to the four Federal decisions cited by the defendants. In *Grand Trunk Ry. v. Michigan Ry. Comm.*, supra, the court was concerned with the validity of a statute enacted by the state of Michigan regulating carriers. The only portion of the decision which appears to have application to the contentions now under consideration is:

"If a judicial interference is sought with the exercise of such power it must be clearly shown to have been transcended, not left as a conclusion from the balance of conflicting affidavits, or even, it may be, as held by the District Court, on ex parte affidavits. Courts are reluctant to interfere with the laws of a State or with the tribunals constituted to enforce them."

In *Interstate Commerce Comm. v. Louisville & Nashville R. R. Co.*, supra, the court was concerned with the validity of a schedule of rates made by the interstate commerce commission. The entry of the order had been preceded by the entry of findings of fact. Apparently, the following is the portion of the decision upon which the defendants rely:

"Under the statute the carrier retains the primary right to make rates, but if, after hearing, they are shown to be unreasonable, the commission may set them aside and require the substitution of just for unjust charges. The commission's right to act depends upon the existence of this fact, and if there was no evidence to show that the rates were unreasonable, there was no jurisdiction to make the order. Int. Com. Comm. v. Northern Pacific Ry., 216 U. S. 538, 544. In a case like the present the courts will not review the commission's conclusions of fact (Int. Com. Comm. v. Delaware &c. Ry., 220 U. S. 235, 251), by passing upon the credibility of witnesses, or conflicts in the testi-

mony. But the legal effect of evidence is a question of law.''

*City of Knoxville v. Knoxville Water Co.,* supra, was a suit to restrain a city from the enforcement of a city ordinance which prescribed the rates which the water company could charge for its service. After the pleadings had been formulated the cause was referred to a special master whose report was later confirmed by the trial court. One of the issues determined in the decision was whether the master's report was entitled to greater weight than the implied fact-findings of the ordinance. In disposing of this contention, the court declared:

''Here are findings of fact by a master, confirmed by the court. The company contends that under these circumstances the findings are conclusive in this court, unless they are without support in the evidence or were made under the influence of erroneous views of law. * * * The function of rate-making is purely legislative in its character, and this is true, whether it is exercised directly by the legislature itself or by some subordinate or administrative body, to whom the power of fixing rates in detail has been delegated. The completed act derives its authority from the legislature and must be regarded as an exercise of the legislative power. Prentis v. Southern Railway Co., 211 U. S. 210; Honolulu Transit Co. v. Hawaii, 211 U. S. 282. There can be at this day no doubt, on the one hand, that the courts on constitutional grounds may exercise the power of refusing to enforce legislation, nor, on the other hand, that that power ought to be exercised only in the clearest cases. The constitutional invalidity should be manifest, and where that invalidity rests upon disputed questions of fact the invalidating facts must be proved to the satisfaction of the court. In view of the character of the judicial power invoked in such cases it is not tolerable that its exercise should rest securely upon the findings of a master, even though they may be confirmed by the trial court. The power

is best safeguarded against abuse by preserving to this court complete freedom in dealing with the facts of each case. Nothing less than this is demanded by the respect due from the judicial to the legislative authority. It must not be understood that the findings of a master, confirmed by the trial court, are without weight, or that they will not, as a practical question sometimes be regarded as conclusive. All that is intended to be said is, that in cases of this character this court will not fetter its discretion or judgment by any artificial rules as to the weight of the master's findings, however useful and well settled these rules may be in ordinary litigation. We approach the discussion of the facts in this spirit.''

*San Diego Land Co. v. National City,* supra, was a suit by a corporation engaged in distribution of water to restrain the municipality from putting into effect a schedule of charges made by the city. The following appears to be the portion of the decision upon which the defendants rely:

''But it should also be remembered that the judiciary ought not to interfere with the collection of rates established under legislative sanction unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without such compensation as under all the circumstances is just both to the owner and to the public; that is, judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use.''

Before determining the effect which should be attached to the commissioner's order, we deem it advisable to take note of three further adjudications by the Federal supreme court. In *Ohio Valley Water Co. v.*

*Ben Avon Borough,* 253 U. S. 287 (40 S. Ct. 527, 64 L. Ed. 908), the facts were: The public service commission of Pennsylvania, after taking evidence, found the value of the water company's property to be $924,744, and then prescribed a schedule of rates. The water company, claiming that the valuation was too low and that the rates prescribed in the commission's order were confiscatory, appealed to the superior court of Pennsylvania. The latter, after a hearing, reversed the commission's order, appraised the property as worth $1,324,621.80, and ordered the commission to prescribe a higher rate schedule. The city then appealed to the supreme court of Pennsylvania, which held that since there was competent evidence in support of the commission's appraisement of the property's value, the appraisement was binding upon the courts and the superior court was without authority to substitute its judgment for that of the commission. Referring to the Pennsylvania supreme court's decision, the United States supreme court said:

"Looking at the entire opinion, we are compelled to conclude that the supreme court interpreted the statute as withholding from the courts power to determine the question of confiscation according to their own independent judgment when the action of the commission comes to be considered on appeal."

In holding that this view was erroneous and in reversing the Pennsylvania supreme court's decision, the Federal supreme court said:

"In all such cases, if the owner claims confiscation of his property will result, the state must provide a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts; otherwise, the order is void because in conflict with the due process laws, Fourteenth Amendment. * * * Without doubt,

the duties of the courts upon appeals under the act are judicial in character—not legislative as in Prentis v. Atlantic Coast Line Co., supra. This is not disputed; but their jurisdiction, as ruled by the Supreme Court, stops short of what must be plainly intrusted to some court in order that there may be due process of law. Plaintiff in error has not had proper opportunity for an adequate judicial hearing as to confiscation.''

See also Mott, Due Process of Law, § 90.

In *Crowell v. Benson*, 285 U. S. 22 (76 L. Ed. 598, 52 S. Ct. 285), the facts were: The defendant, a deputy commissioner of the United States Employees Compensation Commissions, after a hearing had held that (a) one Knudsen was a longshoreman in the employ of the plaintiff Crowell; (b) that Knudsen had sustained an injury while discharging the duties of his employment; and (c) that the injury occurred upon the navigable waters of the United States. Based upon these findings, the commission entered an order that Knudsen was entitled to receive compensation from Crowell. Thereupon, Crowell brought suit in the Federal courts to enjoin the enforcement of the award. The district court held that it was its duty to make an independent determination of the jurisdictional facts and refused to examine the transcript of testimony taken before Benson. At the conclusion of the trial it entered judgment in favor of the employer. Its decision was affirmed by the Federal circuit court of appeals. In sustaining these two decisions, the majority of the Federal supreme court held that (1) since the United States Employees Compensation Act renders the employer liable, irrespective of negligence, and (2) since the compensation act could not be applicable unless the injury occurred upon the navigable waters of the United States, findings that (a) the individual

against whom the award was made was, in fact, the employer of the claimant, and (b) that the injury did, in fact, occur upon the navigable waters of the United States, were jurisdictional or constitutional facts upon which Crowell was entitled to the court's independent findings. It pointed out that under the separation of powers the commission's findings upon these constitutional or jurisdictional facts could not be binding upon the courts when the validity of the award was under attack. We quote from the decision:

"In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function. The case of confiscation is illustrative, the ultimate conclusion almost invariably depending upon the decisions of questions of fact. This court has held the following to be entitled to 'a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts' * * *. In the present instance, the argument that the Congress has constituted the deputy commissioner a fact-finding tribunal is unavailing as the contention makes the untenable assumption that the constitutional Congress may be deprived in all cases of the determination of facts upon evidence, even though a constitutional right may be involved. * * * But when fundamental rights are in question, this court has repeatedly emphasized 'the difference in security of judicial over administrative action'."

In *Ng Fung Ho v. White,* 259 U. S. 276 (66 L. Ed. 938, 42 S. Ct. 492), the material facts were that the secretary of labor had ordered the deportation of two individuals who claimed to be citizens of the United States, possessed of a constitutional right to remain here. The Federal supreme court held that, since the absence of citizenship was necessary to give the secre-

tary of labor jurisdiction, the two alleged Chinese were entitled to a judicial determination of their claim of citizenship. We quote from the decision:

"Second, as to Gin Sang Get and Gin Sang Mo a constitutional question also is presented. Each claims to be a foreign-born son of a native-born citizen; and, hence, under § 1993 of the Revised Statutes, to be himself a citizen of the United States. They insist that, since they claim to be citizens, Congress was without power to authorize their deportation by executive order. * * * The constitutional question presented as to them is: May a resident of the United States who claims to be a citizen be arrested and deported on executive order? * * * The precise question is: Does the claim of citizenship by a resident, so supported both before the immigration officer and upon petition for a writ of habeas corpus, entitle him to a judicial trial of this claim? * * * The constitutional question presented in those cases is merely how far the legislature may go in prescribing rules of evidence and burden of proof in judicial proceedings. Fong Yue Ting v. United States, 149 U. S. 498, 729; Bailey v. Alabama, 219 U. S. 219, 238; Luria v. United States, 231 U. S. 9, 26; Hawes v. Georgia, 258 U. S. 1. Here the proceeding is throughout executive in its nature. Jurisdiction in the executive to order deportation exists only if the person arrested is an alien. The claim of citizenship is thus a denial of an essential jurisdictional fact. The situation bears some resemblance to that which arises where one against whom proceedings are being taken under the military law denies that he is in the military service. It is well settled that in such a case a writ of habeas corpus will issue to determine the status. Ex parte Reed, 100 U. S. 13; In re Grimley, 137 U. S. 147; In re Morrisey, 137 U. S. 159; Johnson v. Sayre, 158 U. S. 109. Compare Ex parte Crow Dog, 109 U. S. 556. If the jurisdiction of the Department of Labor may not be tested in the courts by means of the writ of habeas corpus, when the prisoner claims citizenship and makes a showing that

his claim is not frivolous, then obviously deportation of a resident may follow upon a purely executive order whatever his race or place of birth. For where there is jurisdiction a finding of fact by the executive department is conclusive, United States v. Ju Toy, 198 U. S. 253; and courts have no power to interfere unless there was either denial of a fair hearing, Chin Yow v. United States, 208 U. S. 8, or the finding was not supported by evidence, American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, or there was an application of an erroneous rule of law, Gegiow v. Uhl, 239 U. S. 3. To deport one who so claims to be a citizen, obviously deprives him of liberty, as was pointed out in Chin Yow v. United States, 208 U. S. 8, 13. It may result also in loss of both property and life; or of all that makes life worth living. Against the danger of such deprivation without the sanction afforded by judicial proceedings, the Fifth Amendment affords protection in its guarantee of due process of law. The difference in security of judicial over administrative action has been adverted to by this court. Compare United States v. Woo Jan, 245 U. S. 552, 556; White v. Chin Fong, 253 U. S. 90, 93. It follows that Gin Sang Get and Gin Sang Mo are entitled to a judicial determination of their claims that they are citizens of the United States.''

Without making any further review of the decisions, it is apparent from the foregoing that no finding of fact made by the defendant public utility commissioner is conclusive upon the courts unless, among other items, he possessed jurisdiction and authority to make the finding, that it is supported by substantial evidence, that the hearing which he conducted was calculated to reveal the truth, and that he did not apply an erroneous principle of law.

In the instant suit the carrier claims that the rate which it contests was fixed in a proceeding which was not attended by due process of law and that the rate is so low that it will confiscate the carrier's property.

It is abundantly clear that, although rate-making is a legislative function, neither the validity of the statute nor the proceedings pursued by the rate-making body in fixing the rate can be placed beyond the reach of the judicial investigation. In fact, our statute which empowers the public utility commissioner to fix rates itself recognizes that commission-made rates are subject to judicial investigation, and authorizes judicial review of the rate-making orders of the commission (§ 61-254, Oregon Code 1930). Unlike the statutes of some of the other states, our laws do not contemplate that the courts shall confine their investigations to the record made before the commission, but expressly provide that upon review additional testimony may be taken. Thus, § 61-256 refers to evidence "different from that offered upon the hearing before the commission or additional thereto". It is clear that, even though the legislature had not provided for a review of a commission-made rate, the carrier, upon filing a complaint similar to the present one could have obtained a review of the commission-made rate.

We come now directly to the question whether in suits of this character the orders of the public utility commissioner prescribing rates must be deemed prima facie valid, and whether his fact-findings are binding upon the courts. The fact-finding, if there is any, was not made by a commission composed of several individuals, of the character mentioned in the foregoing decisions, but was made by one man only. He is removable from office at the pleasure of his superior who appointed him. The commissioner, instead of owing a duty of being impartial, owes a duty of being one-sided. In support of this statement, we shall not quote the statute once more, but shall merely refer to the following words which expressly provide that even

in the hearing with which we are now concerned it was the duty of the commissioner to take the side of the Spaulding Company "in all controversies respecting rates * * * it shall be his duty to make use of the jurisdiction and powers of his office to protect said patrons". Other portions of our laws empower him to move summarily against carriers and utilities, but give him no similar power to proceed against shippers or other customers guilty of unfair practices. We believe that it is clear that the commissioner's duty is not one of impartiality but one of partisanship. It is his duty to investigate the carriers and utilities, to institute proceedings against them when negotiations fail to yield the desired results, to prod them on, and in other ways enforce executive policies. Since the commissioner is not a judicial officer, but performs a legislative function when he makes a rate, he cannot be expected to ignore the legislative demand of partisanship. We are not now concerned with the question of whether the legislature can authorize a partisan to make rates, but are inquiring whether we must accept his fact-findings as reflecting the truth and whether his orders change the order of proof. If we would not accept the fact-findings of a partisan, of a partisan witness, or of a partisan judge as true, we know of no reason why we should accept as true the findings of a partisan commissioner.

In *Boston v. Baldwin,* 139 Mass. 315 (1 N. E. 417), the facts were: During the course of the trial it developed that one of the jurors was a member of the common council of the city of Boston, which was the party plaintiff and which was affected by the claim in litigation. We now quote from the decision:

"The juror in the case at bar was not disqualified merely because he was an inhabitant of Boston. But

he occupied a position or relation towards the cause and the parties different from that occupied by the ordinary inhabitant. He was a member of the common council, a branch of the government of the city. The municipal government has authority and control over all suits brought or prosecuted by or against the city. It represents the city, and is the guardian and protector of its rights. It was the duty of the juror in question, as a part of the government, to guard and protect the rights of the city. This relation to the city is inconsistent with his serving as a juror in the suit. It would not only create a suspicion of bias, but would naturally tend to create a bias or prejudice in his mind in favor of the city. There can be no certainty that a juror thus situated can stand indifferently and impartially between the parties. The statute does not cover the case, and there is no necessity that members of the city government should act as jurors in cases to which the city is a party.''

From Freeman on Judgments (5th Ed.) § 328, we quote:

"It occasionally happens that while a court has jurisdiction over the subject matter in controversy, and the parties to the action, the judge of the court is disqualified from acting by reason of his having an interest in the suit, or his being related to some of the parties, or his being within some of the disqualifications recognized by the common or by the statute law. 'It is a maxim of every country that no man should be judge in his own cause. The learned wisdom of enlightened nations, and the unlettered ideas of ruder societies are in full accordance upon this point, and wherever tribunals of justice have existed, all men have agreed that a judge shall never have the power to decide where he is himself a party. In England it has always been held that, however comprehensive may be the terms by which jurisdiction is conferred upon a judge, the power to decide his own cause is always a tacit exception to the authority of his office. Such I

conceive to be the law of this state.' These principles extend not only to cases in which the judge is a party upon the record, but also to other cases in which he has an interest, however minute, as where one of the parties is a corporation of which the judge is one of the stockholders.''

The observations made by the New Jersey court in *Public Service Gas Co. v. Public Utility Board*, 84 N. J. L. 463 (87 Atl. 651, L. R. A. 1918A, 421), in regard to findings of the New Jersey Public Utility Board are very pertinent to our present problem. We quote:

''In these cases there is a presumption in favor of the action of the inferior tribunal because in each case that tribunal is acting in a judicial capacity and may fairly be supposed to preserve a judicial attitude. The same rule has been sometimes applied in rate cases, but with less reason.

''The presumption in favor of the acts of a judicial or quasi-judicial tribunal does not apply with the same force to a legislative tribunal, nor to a tribunal which possesses not only to some extent the powers of a court but also to some extent the powers of a public prosecutor. A legislative body prescribing a rule for future conduct is not limited by the same considerations of justice as a tribunal required to do justice in accordance with existing rules; and one in the position of a public prosecutor can hardly be supposed to preserve a judicial frame of mind; he is rather in the position of one who is judge in his own cause. Under the Public Utilities act, the commissioners are given extensive powers of legislation and are given the power of initiating proceedings themselves. The manner in which these powers shall be exercised involves often a consideration of large questions of public policy or business wisdom. For example, in this very case the commissioners have fixed a rate for the Passaic district alone, to the exclusion of all other parts of the state in which the gas company by its charter may operate. Whether it is wise to segregate in this way

a thickly settled territory in which gas may be manufactured in large quantity and distributed at comparatively small expense, so as to give the inhabitants of the populous districts the advantage of their density of population, or whether it is wise to determine the rate by a consideration of the facts throughout the territory served as a whole, so that the smaller towns may profit by the economics resulting from business on a large scale, and so that the charge for distribution through miles of pipe where consumers are few may be reduced by entering into an average with the cost of distribution through short lines of pipe where consumers are many, is a question of public or business policy, not a question of law or abstract justice to be tested by fixed rules. In such a case there may perhaps be a fair presumption that the action of the commissioners is dictated by wise policy but hardly that its action is just and reasonable. In addition, disobedience to the order of the commission subjects to a penalty of $100 per day, and in some cases amounts to a misdemeanor, so that the public service company is entitled to the benefit of the ordinary rules that require penal and criminal statutes to be construed strictly. All these considerations lead us to the conclusion that if there is any presumption in favor of the order of the commissioners, it depends, like the opinion of the court of another state, upon the strength of the reasoning by which it is supported. This is subject, however, to the qualification that in legislative action the courts will not merely substitute their judgment for that of a legislative body.

"We must, therefore, determine for ourselves upon all the evidence whether the former rate for gas in the Passaic district was unjust and unreasonable, and whether the new rate is just and reasonable."

The following authorities also state and apply the rule that any public official intrusted with the power to determine controversies or render fact-findings must be impartial: *Tumey v. Ohio,* 273 U. S. 510 (71 L. Ed.

749, 47 S. Ct. 437, 50 A. L. R. 1243). (The fact that the mayor-judge was rewarded with $12 costs whenever he found guilty a person charged with violation of the prohibition law was held incompatible with due process of law): *Meyers v. Shields*, 61 Fed. 713. (Re-assessment made by an auditor whose income was increased whenever he increased assessment was held void for similar reasons.) See also *State ex rel. Colcord v. Young*, 31 Fla. 594 (12 So. 673, 19 L. R. A. 636, 34 Am. St. Rep. 41); *U'Ren v. Bagley*, 118 Or. 77 (245 P. 1074, 46 A. L. R. 1173); *Rugenstein v. Ottenheimer*, 78 Or. 371 (152 P. 215, Ann. Cas. 1917E, 953). And Cooley's Constitutional Limitations (8th Ed.) p. 870. §§ 1-405, 1-406 and 28-1503, Oregon Code 1930, make abundant provision for an impartial judiciary and in that way state the public policy of our commonwealth.

It seems clear from the authorities that before the courts will accept as determined the fact-findings of an inferior body it must first appear that the latter was impartial and that the procedure which it employed was calculated to reveal the truth. We quote from Mott, Due Process of Law, § 90:

"The courts have developed the doctrine that the question of the reasonableness of the rate is a judicial one and consequently a statute preventing a hearing before the court on this matter violates due process. In hearing the case the court reserves to itself the right to arrive at an independent judgment of both the law and facts. It seems therefore that there is a tendency of the courts to demand, in the interest of inherent justice, that all bodies inferior to itself should operate only under the traditional safeguards of notice and hearing, which in some cases must be judicial in nature."

No man can serve two masters, and it is equally true that no man can justly determine the facts of a contro-

versy in which he participates as an advocate. When the advocate, with legislative sanction, mounts the bench and places the burden of proof upon his opponent the latter is appalled and the community will not view the result with approval. The union in one official of the authority to judge and the power to espouse is foreign to America's conception of fair play. The decisions which hold that a ministerial body may determine a fact stop short of holding that partisan may determine a fact. They accept as determined a fact only when the pronouncement was made by some body which, like the courts, owed no duty and was charged with no responsibility other than that of ascertaining the truth. To hold that we must accept as true the fact-findings of a partisan commissioner and that his orders cannot be overcome except by evidence of a high degree of cogency would be to place in our reports a precedent which will surely embarrass us as time goes on. Such a holding would justify the fears of those who believe that bureaucracy lurks in all administrative bodies. Therefore, we conclude that the demands of due process will not permit us to deem that any fact involved in this controversy has been determined by the public utility commissioner. We shall, therefore, investigate for ourselves the evidence.

Before proceeding further it may be well to determine the purpose we are to serve in our investigation of the record. Rate-making, as was aptly said by Mr. Justice Holmes, "is the making of a rule for the future, and therefore is an act legislative, not judicial in kind". But this contested rate was not made by the legislature—it was made by a commissioner. Since the act creating his office confers upon him no discretionary power and permits him to exercise no judgment of his own, but requires him to establish

rates in dutiful obedience to the standards established by the legislature, he is a ministerial officer, and the functions he performed when he made the contested rate were ministerial. It is, of course, well established that the courts will perform neither legislative nor ministerial functions. Therefore, if § 61-254, Oregon Code 1930, contemplates that in suits of this character we shall review the commissioner's acts but go no further, then we are asked to perform functions of a non-judicial character, and must decline to do so. A statute of West Virginia which conferred upon the courts power to review by trial de novo the fact-findings of a West Virginia commission was held to conflict with the separation of powers provisions of the West Virginia constitution: *Hodges v. Public Service Commission*, 110 W. Va. 649 (159 S. E. 834). For comment see 18 Va. Law Rev. 315. But other courts have taken a different view; for citations see the treatise just mentioned. These courts have held, as we did also in the two decisions already cited, that in suits of this character the court performs a function quite different from that of the commissioner. He makes rates. The courts have no power whatever to make rates. It is the commissioner's duty to establish reasonable rates. It is our duty to ascertain whether the rate he made is so low that it is confiscatory. Incidental to this duty, we examine values—the value of the carrier's property, the value of the service it renders, etc. We merely determine, however, whether the commissioner went below constitutional minimums in fixing values. Likewise, we determine what constitutes a fair return for the carrier, again confining our search to the constitutional minimum.

The Valley & Siletz Railroad Company, to which we shall hereafter refer as the plaintiff, was incor-

porated in 1912, and shortly thereafter proceeded with the construction of its line of railroad. The latter, as already stated, extends from the town of Independence, along the course of the Luckiamute river 35 miles, to a station named Olson, thence in a northwesterly direction five miles farther to the town of Valsetz. At Independence plaintiff's railroad connects with the Southern Pacific Company's railroad. Eleven and three-tenths miles from Independence on the Southern Pacific tracks is a station or log dump named Winona which is across the Willamette river from Salem, where one of the two sawmills of the Charles K. Spaulding Logging Company is located.

In 1918 when the plaintiff put its line in full operation it became a common carrier. Its stockholders are the same individuals who own the stock of a Michigan corporation entitled William W. Mitchell Company, which, on January 1, 1925, owned 1,317,178,000 feet of timber in the vicinity of Valsetz. About the time the railroad was built the William W. Mitchell Company effected an arrangement with an affiliated corporation entitled Cobbs & Mitchell Company, whereby the latter was given the right to cut and convert the Mitchell timber into lumber. In 1920 the Cobbs & Mitchell Company built a sawmill at Valsetz which commenced shipping lumber January 1, 1921. The Charles K. Spaulding Logging Company is the owner of 10,000 acres of land in the vicinity of Olson containing at this time 450 million feet of timber. As we shall later see, the Spaulding Company plans to resume the cutting of its timber and proposes to bring it as saw logs to Winona. From there the logs will be towed across the river to the Spaulding mill at Salem.

All of the witnesses who testified upon the subject agreed that plaintiff's railroad is very well built and

well managed. It has no bonded indebtedness, and no witness claimed that the road was over-capitalized. The first 23 miles pass through an agricultural district which produces but little, if any, business for the line. Then the timbered area is encountered. It contains about four billion feet, including the timber owned by the Mitchell Company and the Spaulding Company. This timber is naturally tributary to plaintiff's line and all of it may move out over plaintiff's railroad when the timber is cut, unless some other means of transportation is provided. From Olson to Independence the course is either level or down grade. There are 14 sawmills located along the line, but all of them, except the Cobbs & Mitchell mill, are small portable mills and operate only intermittently. The hauling of logs, lumber, hog fuel and other timber products provides plaintiff with close to 90 per cent of its income.

December 31, 1924, the plaintiff estimated its road and equipment worth $1,169,856.62, of which amount $87,128.09 was deemed the value of the equipment. Believing that when the timber along its line had been cut there would be no traffic remaining for it, and that its line would have no value except for salvage, the plaintiff, in 1925, made an application to the interstate commerce commission for the privilege of amortizing its investment through rate changes. The privilege was granted, and, based upon the assumption that the Mitchell Company's timber (1,317,178,000 feet) was the only freight likely to pass out over the line, and that it would pass out in the 20-year period beginning 1925, the plaintiff was permitted to enter as an annual depreciation charge 1/20 of the aforementioned sum of $1,169,856.62, less an accumulated amortization and less the salvage value of the line at the end of the 20-year period, which was estimated as $108,-

554.52. The plaintiff was clearly entitled to amortize its investment: *Hammond Lbr. Co. v. Public Service Comm.,* 96 Or. 595 (189 P. 639, 9 A. L. R. 1223).

In 1920 the plaintiff charged a rate of $2.94 per thousand feet applicable to shipments of 10 cars or more of saw logs. In 1922 this rate was made applicable to single carload shipments. October 1, 1924, the plaintiff changed its rate to $3.90 per thousand, and that rate remained in effect until the defendant prescribed the rate which is now under attack.

The Spaulding Logging Company was incorporated in 1897 and in 1899 commenced logging operations in the Luckiamute River district. As time passed it acquired about 17,000 acres of land in that district. Ten thousand acres of this land now hold about 450 million feet of timber. In June, 1918, it began to ship logs over the plaintiff's railroad from Olson. To facilitate the bringing of its logs to Olson the Spaulding Company constructed a short line of railroad.

In or about 1931 serious financial difficulties overtook the Spaulding Company and at that time it ceased all logging and manufacturing operations. About the same time the active management of its affairs passed from Mr. Charles K. Spaulding, founder of the enterprise, to a Mr. Fentriss Hill, Pacific Coast representative of the Detroit Trust Company, which some years previously had marketed a bond issue of the Spaulding Company.

Mr. Spaulding, without giving any supporting testimony, declared that the freight rate charged for hauling logs from Olson to Winona was one of the major factors which forced the closing of his mill. The uncontradicted evidence, however, indicates that, due to the curtailed market, a large number of logging and lumber manufacturing enterprises have suspended operations,

that even low freight rates fail to move logs, and that for a substantial period of time no timber owner has cut his timber unless forced to do so by circumstances beyond his control. The Spaulding Company has a mill at Newberg, 30 miles from Salem, which is favored by a rate of $1.75 per thousand feet. Indicating that freight rates are not altogether controlling is the circumstance that Mr. Spaulding admitted that this mill could not operate profitably upon its low rate. In fact, he volunteered the information that the Newberg mill could not operate even "if you hauled the logs for nothing". The Cobbs & Mitchell plant ceased operations at about the same time that the Spaulding mill closed. It is still idle. Mr. Hill, as a witness in 1934, reviewed some statistical information prepared by a lumbermen's organization which showed that virtually all sawmills were operating at a loss at that time. The evidence also shows that the Spaulding Company's Salem mill is farther from its log supply than any of its competitors and suffers a further disadvantage in being on a joint-line haul. The Spaulding Company witnesses themselves developed these facts and termed them serious disadvantages. It also seems that the Spaulding Company has lost some of its natural market and that its mill and camps are badly in need of modern efficient equipment.

Mr. Hill testified that upon assuming charge of the company's affairs he decided to rehabilitate the mill, purchase efficient equipment, begin cutting the company's timber along the plaintiff's railroad and manufacture the logs into lumber, provided the yield would leave a balance of about $1.50 per thousand feet for stumpage. The Spaulding Company deemed the timber worth $1.74 per thousand feet in 1913. In this manner Mr. Hill planned to liquidate the bonded in-

debtedness. Bank loans ($200,000) would be liquidated from the stocks in the retail yards. In formulating his plans he found, so he testified, "The situation in regard to freight rates was a perfectly impossible one from the Spaulding Logging Company's standpoint; absolutely prohibitive to any operation, whether for profit or liquidation, with the like of which in many years of contact up and down the Coast with lumber operations I have never seen anything to compare." He estimated that $65,000 of new equipment would be necessary to render the sawmill efficient. Twenty-five thousand more would be needed to purchase proper logging equipment and several thousand would be necessary to discharge delinquent taxes so that the company could cut the timber. He added that before any timber could be cut it would be necessary for the owners of the Spaulding defaulted bonds to waive a provision which requires the Spaulding Company to deposit $1.50 per thousand feet into a redemption fund precedent to any cutting. In the event that the needed waiver and a favorable rate were obtained, Hill's plan contemplated bringing in from Olson to Winona daily a maximum of about 140,000 feet of logs, or about 18 carloads.

As a witness, Mr. Hill calculated in the following manner how much the Spaulding Company could afford to pay for a joint rate from Olson to Winona. He assumed a stumpage value of $1.50 per thousand. He estimated an expense of $4 per thousand for labor and supplies in felling the tree, converting it into a saw log and delivering the log at Olson. For manufacturing the log into lumber, paying the sales commission and loading the lumber onto cars at Salem, he estimated an expense of $4 per thousand. Managerial service, bookkeeping and taxes, he believed, would cost 50 cents per

thousand. Towing the logs from Winona to Salem would add 20 cents per thousand. Insurance and miscellaneous items would aggregate 30 cents per thousand. The above items total $10.50. He conceded that some of his estimates were close. He believed that the lumber would find a market at a price of $10.50 per thousand aboard cars at Salem. It will be observed that the above allows nothing for freight charges from Olson to Winona. To take care of this expense Hill estimated that in the manufacture of 1,000 feet of lumber, by-products, consisting of hog fuel, slabwood and sawdust, would be obtained, of a value of $2. This $2 per thousand, according to Hill, would be available to pay the transportation charge from Olson to Winona. These calculations, according to Hill, if verified by the result of operations, "would leave no profit to the Spaulding Company but it would afford a liquidation of $1.50 per thousand. It would return nothing in the way of depreciation on the plant and equipment. * * * The necessities of the company and of the creditors are such that we could afford and would go ahead if we could get $1.50 stumpage out of that without the return of any profit". It will be recalled that at that time the joint rate for log shipments from Olson to Winona was $3.90 per thousand feet.

We come now to a consideration of the evidence which reveals the cost of hauling a carload of logs from Olson to Winona. We believe that this consideration will be facilitated by commencing with the testimony of Mr. J. P. Newell, a consulting engineer. Preliminary to becoming a witness for the Spaulding Company, he made a study of the reports filed by the plaintiff with the public utility commissioner. Newell testified that he calculated what he termed the direct cost of hauling a carload of logs from Olson to Winona in 1929, and

that he also estimated what would be the direct cost of hauling a similar carload in 1933. He testified in March, 1933. He defined direct cost as being "costs which are caused by the operations themselves as distinguished from the indirect costs which are those that would exist whether there were any traffic on the line or not". According to Newell, direct cost consists of the following items: wages paid to the train crew; expense of maintaining the stations, so far as that expense is caused by the operation of trains; purchase price of supplies for the trains; expense of supervising and dispatching the trains; cost of fuel; cost of locomotive supplies; cost of repairing the locomotives; locomotive depreciation; casualty expense; general expenses; miscellaneous items; and the portion of the cost of maintaining the right of way resulting from the wear and tear of the passing trains. Newell testified that he selected the year 1929 because "that was the last year of operation in that joint movement which could be called anywhere near a normal movement. It was of about the same volume as several years previous had been, and would be, I think, a much fairer representation of costs, and particularly upon the Valley & Siletz, than could be obtained from the later years". Excepting only one other year, 1929 gave plaintiff its largest volume of traffic. In making his calculation of direct cost for 1929, Newell disregarded items of cost reported by the Valley & Siletz as having been incurred in 1929 whenever he believed that such items were abnormal. In those instances he used the average of other years. In calculating expenses he took into consideration the experiences of other railroads with which he was familiar. Before stating the results of his calculations, we add that in 1929 the plaintiff hauled a total of 7,497 cars of which 1,921 were loaded with logs (not hard-

wood). Newell estimated that the working season in a logging camp is 240 days, and that, accordingly, in that working season the plaintiff daily hauled in 1929 eight carloads of logs.

Let us now take note of Newell's figures. Plaintiff's unchallenged report shows that it expended for maintenance of way $64,885 in 1929. Newell, however, in making his calculations allowed for maintenance of way only $6,320 (9.75 per cent of $64,885) because "the prevailing cost of maintenance expenses are weather and decay of ties and timber, etc., which are not affected by the volume of traffic. The traffic effect is that of wearing out of the rails and the cutting of ties and the mashing down of ties into the ballast by the weight of the train". Throughout his calculations he pursued a similar method and charged to train operation only the portion of plaintiff's expenses which were directly attributable to the operation of trains. In making these calculations he treated the expenses incurred upon the Southern Pacific Company's portion of the haul in the same manner as the expenses of the plaintiff. In this manner he determined that the direct cost of hauling a carload of logs containing 7,890 feet (the 1929 average load) from Olson to Winona in 1929 was $12.74; that $7.42 of this amount was incurred on the plaintiff's line and $5.32 on the Southern Pacific Company's line. The rate in effect under plaintiff's tariff was $30.77 for a load of 7,890 feet.

Before passing on, let us take note a little more carefully of Mr. Newell's figures. He estimated that only 9.75 per cent of maintenance of way expenses resulted from train operation. Here is how he obtained that percentage: A cost study he had made some years previously persuaded him that in 1925 50 per cent of the Oregon-Washington R. & N. Company's mainte-

nance expenses was due to train operation, and 50 per cent was due to other causes. The density of traffic upon plaintiff's line is only 10.8 per cent as great as that upon the Oregon-Washington R. & N. Company's line. He then made the appropriate reductions and found that 9.75 per cent of plaintiff's maintenance expenses was due to train operation. He admitted that no court had accepted his Oregon-Washington R. & N. estimate as true, and that it was made while he was employed by shippers of that line seeking reduced rates. In estimating the cost of repairing the log cars engaged in the 1929 movement, he ignored the plaintiff's actual experience and used figures reported by other lines and involving cars less subject to injury. He did not make an analysis of the expenses actually incurred by the Southern Pacific Company upon the branch line with which we are concerned, but, in estimating the Southern Pacific Company's direct cost of the haul from Independence to Winona, used data concerning the Oregon-Washington R. & N. Company, the Northern Pacific Company's Washington lines, two logging railroads which operate in Washington, and some other operations of the Southern Pacific Company. Let us consider one item concerning the Southern Pacific Company's branch line which he thus presented. He allowed it only 25 cents per locomotive mile for engine maintenance; but his data showed that the Southern Pacific Company's locomotive expense in Oregon is 41.1 cents, the Northern Pacific Company's 30 cents, the Oregon-Washington R. & N. Company's 34.3 cents; one of the two logging railroads mentioned by him spends 37.9 cents per locomotive mile for engine maintenance, and the other 32.4 cents. Mr. Newell counted as revenue cars the plaintiff's work or service cars which, of

course, are a source of expense but not of revenue. Thereby his estimates were reduced four cents per car. He admitted that several of his expense items, such as locomotive fuel, were too low. We shall review these items no further. We believe that Mr. Newell's own testimony indicates that his estimates of direct costs are too low. After it became evident that they needed revision he made none.

In making his estimates of what a similar movement would cost in 1933, Newell estimated that the Valley & Siletz would pay in 1933 one-third less for wages, materials and supplies than it did in 1929. Fuel costs he reduced 18 per cent. In his calculations he assumed that the Southern Pacific Company's wage scale would be 10 per cent less in 1933 than in 1929, that materials would cost it one-third less, and fuel 18 per cent less. Based upon the assumption that these economies would be effected, Newell estimated that in 1933 the direct cost of hauling a carload of logs from Olson to Winona (based upon a total movement of 7,497 cars) would be $8.98, of which $4.63 would accrue upon the plaintiff's line and $4.35 upon the Southern Pacific Company's line.

Newell did not disclose whether he was aware of the wage scale in effect upon the two lines. When this cause was before the circuit court (March, 1934,) the same wage scale was in effect with plaintiff's trainmen as in 1929 and as at the time of the commissioner's hearing, but since the men worked a less number of hours per month than in 1929 the sum paid to them was correspondingly less. Between 1929 and the time of the commissioner's hearing sectionmen's pay was reduced from $3.20 per day to $2. After the hearing it was increased 50 per cent. The evidence indicates that

plaintiff's bridge foremen, carpenters, carpenter helpers and machinists were given increases in wages, ranging from 22 per cent to 50 per cent since the commissioner's hearing. According to plaintiff's superintendent, ties and bridge timbers doubled in cost since Mr. Newell testified, and other bridge lumber increased in cost very materially. The Spaulding Company's witnesses also testified that the cost of lumber recently materially increased. Mr. Fentriss Hill, the witness whom we have previously mentioned, testified: "The cost of labor is increased about 60 per cent on an average." Possibly, he was interested primarily in the cost of sawmill labor, but his observation warrants the belief that increased wages were general. While Hill, with apparent misgivings, testified before the commissioner that he expected a price of $10.50 for the lumber to be produced if the plant resumed operations, one of the Spaulding Company's witnesses, in the circuit court a year later, swore that under the price readjustments the Salem price was then $16.50 per thousand for the kind of lumber produced by the Spaulding Company. Another witness testified that the price in March, 1934, was $20 per thousand. Newell predicted a 10 per cent reduction in the Southern Pacific Company's wage expense because the trainmen brotherhood had accepted such reduction. It is common knowledge that the agreement under which the reduction was effected expired some months ago.

We shall review no further the evidence concerning the cost of labor and materials. As is evident from the two opinions (majority and dissenting) the transcript of evidence has been read by at least two members of this court. Each of us has read it carefully more than once. From the contents of these two opinions it will

be observed that neither of us has found any evidence that Newell's prediction of reduced costs has come true. We shall, therefore, ignore the prediction.

In making his calculations and estimates, Newell assigned to the freight department 89.1 per cent of the expense items which he took into consideration, and to the passenger department 10.9 per cent of those items. In order to render understandable this distribution, we add that plaintiff's line carried passengers. While its freight department operated numerous freight trains, its passenger department, if we may call it that, operated only four or five trains in 1929. These Mr. Newell called "fishing specials". They were special trains and carried fishing parties. Newell described the business they gave to the line as "utterly insignificant". In 1929 the total passenger car miles on the road aggregated 30,079 and the total freight car miles, 608,851. Of the total first mentioned, 28,984 were accounted for by a gasoline speedster operated by a crew of one man, and 746 were due to the fishing specials. The balance of the 30,079 is accounted for by 349 locomotive miles, presumably run in hauling the fishing specials. Evidently the fishing specials consisted of only one passenger car, except on two occasions. Thus, the freight cars were responsible for 95.3 per cent of the total car miles traveled on the line and the passenger car for only 4.7 per cent. The passenger service provided plaintiff with 10.9 per cent of its gross income. The Spaulding Company urges that a distribution to the passenger department of 10.9 per cent of the affected expenses (such as maintenance of the stations, maintenance of right of way, etc.) is proper. The plaintiff contends that user is the proper basis of apportionment and that, therefore, to the passenger department 4.7 per cent of these expenses should be assigned. When

Newell was asked if he had ever before distributed such expenses on a revenue basis, he replied: ''I can't answer that now positively'', and, finally, recalled that in one case he did ''assign some expenses of minor importance'' in that manner, adding that he did so ''because it was not very important''. He testified: ''I recognize the fact that this is a freight road and its passenger operation is an incidental affair.'' He admitted that revenue apportionment was not ''logical apportionment'' and declared, ''I don't maintain that it is a logical method of doing it.'' The Federal circuit court of appeals in *Bellamy v. Missouri & N. A. R. Co.,* (C. C. A.) 215 Fed. 18 (L. R. A. 1915A, 1), in referring to apportionment upon a revenue basis, said that such apportionment ''has been held not to be an accurate way, standing alone, of determining the operating expense as between intrastate and interstate business''. It is at once evident that if apportionment on a revenue basis is not proper, Newell's tabulations must be revised. There is $9,444.94 difference between employing 10.9 per cent and 4.7 per cent it seems reasonable to infer that a gasoline speedster would not need as heavy a roadbed as the freight cars and their locomotives. The speedster received no service whatever from the locomotives. Switch tracks, switch engines and other yarding facilities were of virtually no consequence to it. The freight trains were operated by a crew of several trainmen—the speedster was handled by one man only. There was no inter-line movement by the passenger car with resulting involved accounts. Since the charge for handling logs was based upon the number of thousand feet put upon the cars, a log scaler was necessary. From time to time it was necessary when log movements occurred to run a derrick over the line to recover lost logs.

Of course, the passenger department ought not to be charged with any part of the expense of the scaler, derrick and similar items. These and other circumstances suggest that the passenger department ought not to contribute any great amount to the road's taxes and other expenses. The proportionate distribution of these expenses is a matter which ought to be governed by business judgment. We believe that the circumstances aforementioned and the character of the service rendered by the plaintiff warrant a conclusion that the distribution of expenses should be made on the basis of user rather than on the basis of revenue. We conclude that the freight department should be charged with 95.3 per cent of the affected expenses.

We shall now undertake to determine the entire cost of hauling a carload of logs (7,890 feet) from Olson to Winona. The taxes upon plaintiff's line in 1929 were $12,660. If we assign to the passenger department 4.7 per cent of this sum, we have $12,065 to be borne by 7,497 carloads of freight or $1.60 per car. The amount of taxes paid by the Southern Pacific Company upon the part of its line involved in this proceeding (11.3 miles) is not disclosed by the record. It will be recalled that the bureau of accounts of the interstate commerce commission authorized the plaintiff to amortize its investment by adding to its annual expense 1/20 of the amount to be amortized; that is, $38,858. If this is spread over 7,497 cars, we have an expense of $5.18 which must be borne by each car. But one of the Spaulding witnesses testified that a fairer method of amortization is to spread the amortization amount over the four billion feet of available timber. If we do so we have an amortization distribution of 22½ cents to be borne by every thousand feet of timber, or $1.77 for each car containing 7,890 feet. It will be recalled that in 1929

the plaintiff expended for the maintenance of its right of way $64,885, and that Newell in his calculations concerned himself with only $6,320 of this sum. Here we have $58,565 which the line had to earn to discharge this item of expense. Assuming that 4.7 per cent is the percentage to be borne by the passenger department, and, making the deduction, we have left $55,813 to be distributed over 7,497 cars, or $7.44 to be added to the cost of every car. By ignoring plaintiff's actual general expenses in 1929, and taking in their stead the average of a preceding five-year period, Newell eliminated $6,287.08. Reducing the sum just mentioned by 4.7 per cent, we have $5,991.59 to be borne by 7,497 cars, or an expense of 79 cents for each car. The plaintiff owned no cars and the uncontradicted testimony shows that it paid a car rental of $1 per day to the Southern Pacific Company. Its average detention of cars was a day and a half. The rental per car was, therefore, $1.50, which the evidence indicates is below cost. Each car, therefore, must be charged $1.50 to obtain the actual cost of hauling a carload of logs. Thus, employing the minimum amortization cost, we have a total of $13.10 of indirect costs to be added to the sums determined by Mr. Newell. When these indirect costs are added to the direct ones delineated by him, we have $25.84 for the haul. This total allows the Southern Pacific Company nothing for its indirect costs and allows neither carrier any profit.

Approximately $20,000 of the maintenance of way expense incurred in 1929 was due to the relaying of five miles of plaintiff's track with heavier rails. The respondents contend that, therefore, we must deduct $20,000 from the total of $64,885 in order to get a sum which will correctly foreshadow future annual maintenance of way expenditures. Let us see what the line

spent for maintenance since it began operations in 1918. It spent for this purpose in

| | |
|---|---|
| 1918 | $31,351 |
| 1919 | 25,900 |
| 1920 | 48,774 |
| 1921 | 60,326 |
| 1922 | 63,065 |
| 1923 | 64,255 |
| 1924 | 68,232 |
| 1925 | 77,789 |
| 1926 | 59,065 |
| 1927 | 54,060 |
| 1928 | 52,373 |
| 1929 | 64,885 |

Thus, it is seen that the 1929 total was exceeded in 1924 and 1925. In 1921, 1922, 1923 and 1926 the amount spent for maintenance came near to the 1929 expenditure. If we ignore the first three years, when the maintenance expenditures were possibly influenced by the fact that the roadbed and ties were new, and take the average of the period 1921 to 1928, both inclusive, we have $62,398. It is thus evident that the 1929 expenditure is fairly representative of the annual amount. At any rate, a deduction of $20,000 is uncalled for.

Respondents contest the $6,287 portion of the general expense item. Referring to it, their brief states: "It is an obvious case of padding of expenses to avoid the recapture of excess earnings by the interstate commerce commission." This statement is not supported by any evidence, unless we accept as supporting evidence the fact that the item of general expense was higher than the same item in some other years. The actual figures are:

| | |
|---|---|
| 1918 | $ 5,283 |
| 1919 | 6,179 |

| | |
|---|---|
| 1920 | $ 5,795 |
| 1921 | 7,923 |
| 1922 | 10,447 |
| 1923 | 10,597 |
| 1924 | 7,728 |
| 1925 | 8,006 |
| 1926 | 15,915 |
| 1927 | 16,310 |
| 1928 | 16,199 |
| 1929 | 16,550 |

From 1918 to and including 1921, the plaintiff sustained an annual deficit. In 1922 it earned a profit of $11,826. Its profit in 1926 was $80,109. It seems reasonable to conclude that as plaintiff's business increased in volume and as it gradually overcame its losses and supplanted them with profits, its general expenses increased. We also notice that by adding $6,000 or so to administrative expenses it reduced its operating expenses about $15,000. Let us also recall that 1929 favored the plaintiff with a volume of business that was exceeded in only one other year.

But, notwithstanding these circumstances, let us ignore the $20,000 expenditure and the $6,287 balance of the 1929 administration expense. If we take from $64,885 $20,000 and $6,320, we have $38,565. If we deduct from this 10.9 per cent, we have $34,391. When this sum is distributed over 7,497 cars, we have an expense of $4.59 to be borne by each car. If we eliminate entirely the general expense item, allot to the passenger department 10.9 per cent of the taxes, regard $1.50 car rental as a proper item and $1.77 per car as the proper amortization charge, we have a total of $9.46 indirect charges. When this is added to Newell's direct charge of $12.74, we have a total of $22.20 as the cost of the

haul from Olson to Winona. We add that this calculation allows nothing to the Southern Pacific Company for its indirect costs, and, of course, allows nothing to either company for interest on invested capital. Nevertheless, we have exceeded to the extent of $2.20 the rate allowed by the commissioner. It will be observed that we have made every deduction upon which the respondents insist and have used the percentage of 10.9 which they favor.

But the respondents argue that it is improper to apportion indirect costs equally among all cars moved. Before considering this contention, we add that, if apportionment of the above expenses had been made upon a basis of car miles traveled, the results would have been substantially the same. The respondents argue that in making apportionment we must take into consideration the commodity, its weight, value, distance hauled, grades, curves, etc.

In 1929, 98.95 per cent of all of plaintiff's freight was timber products—logs, pulpwood, lumber, cordwood. In that year only 79 loaded cars moved from Independence to Valsetz or waypoints. Approximately 53 per cent of the plaintiff's traffic, when judged by the number of cars or the total number of tons hauled, originated at Valsetz, 41 miles from Independence. Twenty-eight per cent originated at Olson, the Spaulding Company's shipping point, 36 miles from Independence. The remainder originated at points nearer to Independence. The freight from Valsetz was approximately 64 per cent lumber and 36 per cent hog fuel, wood, etc. The freight from Olson was logs.

When we consider the proper apportionment of tax, administrative, maintenance of way, etc., expenses, it would seem proper to take note of the following dif-

ferences between a carload of lumber and a carload of logs: The former is more valuable. A carload of logs, due to its unbalanced condition, does more damage to the line than a carload of lumber. In a carload of lumber there is nothing but lumber to discharge the transportation expense, but in a carload of saw logs there is the $2 worth of by-products for every 1,000 feet of logs. If the car is loaded with 10,000 feet of logs, and the contested rate is in effect, the by-products will pay the entire freight bill. It will be recalled that the Spaulding Company expects to pay its entire freight charges with by-products. Due to the manner of loading and unloading, log cars more frequently need repairs than other freight cars. Because the rate upon log shipments is based upon quantity loaded, a scaler is necessary, and here we have an additional employee. To recover the occasional log which rolls off cars while in transit, a derrick is run over the line from time to time at additional expense. Log cars when brought into Winona in trains of 16 cars are run upon the log dump siding in groups of eight. While the locomotive is engaged in these switching operations, which require about 30 minutes time for each eight-car group, the balance of the train is idle. Only one eight-car group is handled per day. The following day the returning train releases its engine which removes the empty cars from the siding and then runs upon it the other eight cars. These operations, which are peculiar to log trains, involve time and expense.

The above, we believe, are the only differences affecting expense disclosed by the evidence.

The following is a comparison of the rates charged by the plaintiff for moving cars containing minimum

loads of saw logs, lumber and fuel wood from Valsetz to Independence:

|  | Saw logs 7,000 foot load | Lumber 40,000 pounds | Fuel 18 cords |
|---|---|---|---|
| Average revenue per car ........ | $21.875 | $34.00 | $25.92 |
| Average revenue per car mile | .533 | .8292 | .632 |
| Average revenue per 100 lbs. ... | .039 | .085 | .048 |

The figures just mentioned give us the classification of these three commodities made by the carrier. Since no one questions their propriety, we shall assume that they are proper. Here we have a classification which we can use in the apportionment of the expenses with which we are concerned; that is, the balance of $58,565 maintenance expense, $12,660 tax expense, and $6,-287.08 administrative expense. These total $77,512.08. We reduce this sum .047 per cent ($3,643.06) and have left $73,869.02. It will be seen from the figures set forth in the preceding column that a carload of logs yields only .267 per cent of the revenue of a train made up of an equal number of cars loaded with logs, lumber and fuel. Twenty-six and seven-tenths per cent of $73,-869.02 is $19,723.02. Here we have a sum which we properly charge against the log cars, if one-third of every train is made up of log cars. Only .256 per cent of the 1929 movement was log cars. The difference in percentage renders appropriate a reduction of $1,518, and we have left $18,205. When this sum is divided among 1,921, we have an expense of $9.48 to be borne by each log car. To this we must add $1.50 car rental, $1.60 amortization, and the $12.74, direct cost estimated by Mr. Newell. The total is $25.32. It will be observed that this allows nothing to the Southern Pacific Company for its indirect costs and nothing for profit.

If we use as the basis of our calculation revenue per mile or revenue per 100 pounds, the result is not materially changed. If, instead of employing minimum loads, we employ the actual loads carried, the results are not materially changed. In 1929 the plaintiff hauled 3,435 carloads of lumber. The average contents of these cars was 79,100 pounds. In the same year it hauled 2,000 fuel cars with average loads less than the minimum, 18½ cords. The 1,921 log cars hauled in 1929 carried 7,890 feet. Making the necessary calculations, we find that to each log car there should be apportioned $7.42 of the undistributed expenses, and that, therefore, the cost of its haul is $23.26, without allowing any profit, and without considering any of the Southern Pacific Company's indirect expenses. The above calculations are based upon a haul from Valsetz to Independence, but the proportion would be the same if we carried the freight through Independence to Winona. We have used the figures applicable to the Valsetz-Independence haul because they are available and unquestioned. The major portion of the freight with which we are concerned when we apportion these expenses was hauled between those two points.

We shall mention one more fact before we leave this phase of the case. In 1929 plaintiff's income had the benefit of the revenue produced by the 3,435 lumber cars, each of which paid an average sum of $67.23 for being hauled from Valsetz to Independence. Its income was also increased by 2,000 fuel cars, each of which paid $25.92 for the same haul. The charge applicable to a log car containing 7,890 feet for the Valsetz-Independence haul was $24.65. Thus, a lumber car carrying an average load brought the plaintiff 2.7 times the revenue of a log car. A fuel car produced $1.27 more income than a log car. It was, therefore, these 5,435 lumber

and fuel cars that defrayed the major portion of plaintiff's 1929 expenses; but now the depression has eliminated them from the tracks. If the plaintiff is now forced to accept 5,400 log cars at the commission-made rate, it will have three times as much low rate freight as ever before, and each log car will pay 35 to 66 per cent less than in 1929 (depending upon the size of its load). Fifty-four hundred cars constitute 69 per cent of plaintiff's 1929 total business, and from these cars plaintiff will derive about 18 per cent as much as its total 1929 income. It is impossible to find in the revenue produced by the log cars a sum sufficient to take care of the cost of the haul.

So far we have ignored profit. Mr. Newell assumed the plaintiff's railroad was worth $1,000,000, and since this is more than $100,000 less than the valuation placed upon the line by the interstate commerce commission, we may safely use the figure $1,000,000. A few years ago the efforts of the Oregon Electric Railway to purchase plaintiff's line at a price of $2,000,000 were frustrated by a ruling of the interstate commerce commission which held that the line should not become a tributary of the Northern lines. The uncontradicted evidence shows that the interstate commerce commission believes that a return of 5.75 per cent is a proper return upon capital invested in railroads. Five and 75/100 per cent of $1,000,000 is $57,500. If we use the basis of apportionment for this profit that we used in apportioning the taxes, maintenance of way and administrative expenses, we have a distribution of $7.07 to each log car.

The respondents repeatedly state that the plaintiff is a very prosperous carrier. The uncontradicted evidence shows that the plaintiff has never paid a dividend. It has, however, made disbursements from the afore-

mentioned amortization fund which, according to the plaintiff's records, aggregated $360,063 in 1931. Here are the figures showing profits earned and deficits incurred since the plaintiff began operations:

| | | |
|---|---|---:|
| 1918 | deficit | $27,120 |
| 1919 | do | 38,658 |
| 1920 | do | 46,254 |
| 1921 | profit | 12,703 |
| 1922 | do | 32,291 |
| 1923 | do | 52,869 |
| 1924 | do | 58,714 |
| 1925 | do | 35,172 |
| 1926 | do | 64,560 |
| 1927 | do | 46,477 |
| 1928 | do | 54,101 |
| 1929 | do | 48,006 |
| 1930 | do | 6,722 |
| 1931 | deficit | 48,981 |

The excess of profits over deficits is $250,662. This excess has not been disbursed to the stockholders, but was apparently plowed back into the investment. In 1918 the book value investment of the road and its equipment was $906,959, but since that time a total of $365,344 was added to these accounts. After the $360,063 was subtracted and $365,344 added to the investment account, the investment items aggregated $912,241 in 1930. Materials, supplies, etc., brought the total to $999,878 in that year. A return of 5.75 per cent upon $1,000,000 would yield $57,500 annually, and in the 14-year period covered by the above figures the total would have been $805,000. If we deem the $360,063 amortization fund distribution as a dividend (which it was not), then the stockholders received a return of 2.5 per cent on their investment.

The data which we have employed in the preceding paragraphs were taken from exhibits which, in our opinion, were properly received in evidence. We believe that we are entitled to assume that these exhibits reflect the truth. In fact, there is no conflict between the witnesses, and none between the documents which were received in evidence, when note is taken of the purpose for which they were prepared. The records of the plaintiff and its entries in its books were not criticized by any of the witnesses, although at least two of the Spaulding witnesses examined plaintiff's expense accounts with exacting care. We must mention one exception to the statement just made. One of the Spaulding witnesses found that plaintiff carried a depreciation account of equipment after the account exceeded by $15,700 the original investment cost. Since counsel do not mention this matter in their briefs and said nothing about it upon oral argument, possibly, its importance is slight or an explanation was made of it which did not make its way into the record.

Seven thousand four hundred and ninety-seven cars, the 1929 movement, is almost the capacity of plaintiff's railroad as a one-train railroad. The addition of a second train would require more equipment, a larger crew, etc. If the Spaulding Company should ship 5,400 cars per year, in fulfillment of Mr. Hill's hopes, the movement would be 72 per cent of the approximate present capacity of the line.

One more item of evidence needs to be mentioned, and we shall have mentioned all of the evidence taken before the commissioner and the circuit court judge. The Spaulding Company proved the charge made for log hauls upon many other carriers operating in the Pacific Coast states and the two affected carriers countered with other tariffs. The rates revealed by

the Spaulding Company's evidence are lower than those applicable to the haul from Olson to Winona. The following circumstances, however, are worthy of note: Many of the low rates are for single line hauls. In many instances the carrier, after bringing in the saw logs from the woods, hauls the lumber a long distance from the mill to the market. Plaintiff never sees the timber after the log leaves its line, and the Southern Pacific Company receives only 44.8 per cent outbound haul of the manufactured lumber. Some of the other low rates were established to meet water competition or were influenced by the carrier's desire to market timber owned by itself. In some instances the low rates were applicable if the shipper furnished the cars. Several of the low rates apply to main-line hauls where the greater density of traffic and the hauling of high-priced commodities enable the carrier to relieve the log traffic of a larger portion of the indirect costs. On main-line hauls the locomotives pull a maximum load; on plaintiff's line the number of cars to the train is small. Something of the situation which confronts the plaintiff is indicated by the fact that in 1929 the mileage of loaded freight cars handled by itself was 297,439 while the mileage of empty freight cars was 259,895. One of the Spaulding witnesses, in commenting upon this feature, expressed it thus: "You practically have an empty haul one way."

Comparisons of rates do not necessarily tend to establish the reasonableness of either and comparisons are never persuasive unless the conditions under the contested rate are similar to those under the other rates: *Louisville & Nashville R. R. Co. v. United States,* 238 U. S. 1 (59 L. Ed. 1177, 35 S. Ct. 696); 10 C. J., Carriers, p. 420, § 649. Since the Spaulding Company failed to prove that the conditions under the outside

rates were similar to those under the contested rate, and since the carriers made uncontradicted explanations revealing substantial differences of condition, we are forced to ignore this portion of the evidence.

In the above calculations we included a rental of $1.50 per day. Mr. Newell did not include this item in his calculations, saying that it was a capital item, and that, if it were entered as a debit in plaintiff's account, one would have to regard it as a credit in determining the Southern Pacific Company's indirect costs. Possibly that is true. But neither Mr. Newell nor any other witness determined the amount of the Southern Pacific Company's indirect costs. In our above calculations we have allowed nothing to that carrier for indirect costs. It is as clear that the plaintiff paid $1.50 rental per car as it is that it bought fuel and paid trainmen's wages. There is no reason why this necessary charge should be ignored.

Before considering the principles of law applicable to this suit, let us take note once more of the fact that the rate under attack was made by a partisan. The rate it attempts to supplant was made by the carrier and was in effect for ten years or more before the commissioner entered his order. Under it the Spaulding Company operated successfully, and continued to operate successfully, until the lumber market suffered the reverses which began to manifest themselves in 1930. We quote from Mr. Spaulding's testimony: ''Take all of the rates all through the entire time from the beginning up to the fall of 1930, they were $3.90 a thousand, except part of the year 1920, 1921 and 1922, when they raised the rates 85 cents a thousand. I believe the attorney said they did not change the rates the same as the shifting of sand, but when the prices went down of lumber the freight rates remained just the same.''

Thus, for ten years or more the rate was around $3.90 per thousand feet, and yet there was no complaint. As we have seen, the rate yielded to the carrier only a modest profit. Apparently, there would be no complaint today if the lumber business were in normal condition. It is worthy of note that no shipper along plaintiff's line and no timber owner in the Luckiamute district has joined with the plaintiff in this proceeding. The fact that the Inman-Poulsen Lumber Company and the Weyerhaueser Timber Company, large manufacturers owning extensive bodies of timber along plaintiff's line, have neither joined plaintiff in its demand nor given testimony in support of plaintiff's proceeding is significant. But, as already stated, the rate established by the carrier was ten years or more old before the commissioner entered his order. The Federal supreme court in *Louisville & Nashville R. R. Co. v. United States,* supra, pointed out that a presumption of reasonableness arises in behalf of a long-established rate ''especially so where, as here, the rate has been in force for a long period during which time the traffic greatly increased in volume''.

The Spaulding Company's real complaint is the absence of profit in the lumber business. In the hearing before the commissioner it proved the constant decline of lumber prices, beginning about 1929. Yet the plaintiff hauls none of the Spaulding Company's lumber and the latter does not propose to ship any lumber over plaintiff's line. When the cause reached the circuit court the price of lumber had leaped to the 1929 level. Manifestly carriers' rates can not become as mercurial as commodity prices. Now the complaint is made that today's lumber prices, although high, yield no profit; yet the presence or absence of profit in a transported commodity can be of little concern

to the carrier. If an article is high-priced, its injury will subject the carrier to a large claim for damages—that, rather than the element of profit-margin, is the circumstance that affects the rate.

The principles of law applicable to the main issue before us, that is, whether the rate prescribed by the public utilities commissioner is confiscatory, appear to be well settled and to be simple in their nature. Before proceeding with their statement, we pause to take note of the fact that the plaintiff is not insisting that it is entitled to make a profit upon the scant movement of freight which today presents itself. It does not contest the rule that a carrier can charge no more than the value of the service which it renders to those who use its facilities, nor does it argue that, if the charge thus prescribed fails to yield a profit or to equal the cost of rendering the service, the carrier can complain:

From Watkins, Skippers and Carriers, § 45, we quote:

"When private property is devoted to a public use, organized society has the right to regulate the charges for such use. This right may be exercised by or under the authority of state laws when the use is within the state, and subject to the further limitation that the regulation does not extend to a taking of private property without due process of law or without fair compensation.   *   *   *"

In § 46 the same authority states:

"Investors are entitled to a reasonable return on the fair value of the property devoted to the public use."

The following is taken from *Smyth v. Ames,* 169 U. S. 466 (42 L. Ed. 819, 18 S. Ct. 418):

"In view of the adjudications these principles must be regarded as settled: 1. A railroad corporation

is a person within the meaning of the Fourteenth Amendment declaring that no State shall deprive any person of property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. 2. A state enactment, or regulations made under the authority of a state enactment, establishing rates for the transportation of persons or property by railroad that will not admit of the carrier earning such compensation as under all the circumstances is just to it and to the public, would deprive such carrier of its property without due process of law and deny to it the equal protection of the laws, and would therefore be repugnant to the Fourteenth Amendment of the Constitution of the United States. 3. While rates for the transportation of persons and property within the limits of a State are primarily for its determination, the question whether they are so unreasonably low as to deprive the carrier of its property without such compensation as the Constitution secures, and therefore without due process of law, can not be so conclusively determined by the legislature of the State or by regulations adopted under its authority, that the matter may not become the subject of judicial inquiry.  *  *  *''

From *Mississippi R. R. Comm. v. Mobile & Ohio R. R. Co.,* 244 U. S. 388 (61 L. Ed. 1216, 37 S. Ct. 602):

''But, while the scope of this power of regulation over carriers is very great and comprehensive, the property which is invested in the railroads of the country is nevertheless under the protection of the fundamental guaranties of the Constitution and is entitled to as full protection of the law as any other private property devoted to a public use, and it can not be taken from its owners without just compensation or without due process of law.  *  *  *  If this power of regulation is exercised in such an arbitrary or unreasonable manner as to prevent the company from obtaining a fair return upon the property invested in the public service it passes beyond lawful bounds, and

such action is void, because repugnant to the due process of law provision of the Fourteenth Amendment to the Constitution of the United States. * * * Whether a statute enacted by the legislature of a State or an order passed by a railroad commission exceeds the bounds which the law thus sets to such authority is a question of law arising on the facts of each case (Mississippi Railroad Commission v. Illinois Central R. R. Co., supra) and the appropriate remedy for determining that question is a bill of equity such as was filed in this case to enjoin its enforcement.''

From 4 R. C. L., Carriers, p. 608, § 79, we quote:

''Although a railroad is a quasi public corporation and operates a public highway, it has nevertheless rights which the legislature can not take away. Although it is under governmental control, that control must be exercised with due regard to constitutional guaranties for the protection of property. And so the power which a legislature has to limit or regulate rates is not without limit. * * * If the rates are fixed at an amount insufficient to permit the carrier to obtain a reasonable return for the services rendered, they are invalid.''

From *Coal etc. Co. v. Conley,* 67 W. Va. 129 (67 S. E. 613), we quote:

''Whether a statute is thus confiscatory does not depend upon the amount it takes in violation of the constitution, or the extent to which it interferes with the right of use of property, guaranteed by the organic law. It is void, if it so takes any at all or so interferes to any extent whatever. It is condemned, not by the extent of the pecuniary injury wrought, but by its transgression of constitutional limits, in its invasion of a constitutional right, as sacred to corporations as to the humblest citizen of the land, and justly so for the reason, among others, that the property of corporations is in fact the property of citizens, and the law can not, and ought not, in its ultimate results, to favor one citizen or class of citizens over another.''

The constitutional provisions which protect us against the confiscation of our property protect not only the title but also the profit-earning capacity of our property. The security afforded by due process clauses would amount to nothing if the states could take the contents and leave the shell. Corporate property is valuable to the stockholders only on account of its profit-earning capacity. The cases we shall now mention briefly render it clear that the profits, as well as the title, are protected.

From *Ohio Utilities Co. v. Commission,* 267 U. S. 359 (45 S. Ct. 259, 69 L. Ed. 656), we quote:

"As bearing upon the amount of return to which the company is entitled, a summary of the foregoing may now be considered: value of property for rate-making purposes, $154,655.93; annual amount of income based upon rates fixed by commission, $53,563; operating expenses, together with amount of annual depreciation allowed by commission, $45,996.85; leaving a balance as return to the company of $7,566.15, or less than five per cent upon the value of the property. That this is so plainly inadequate as to result in depriving the company of its property without due process of law may not be doubted. See Bluefield Co. v. Pub. Serv. Comm., 262 U. S. 679, 692-695, and cases cited; S. W. Tel. Co. v. Pub. Serv. Comm., 262 U. S. 276, 288. From the foregoing it is evident that the state supreme court did not accord to the plaintiff in error that sort of judicial inquiry to which under the decisions of this court it was entitled. Bluefield Co. v. Pub. Serv. Comm., supra, p. 689; Ohio Valley Co. v. Ben Avon Borough, 253 U. S. 287, 289."

From *Denver v. Denver Union Water Co.,* 246 U. S. 178 (62 L. Ed. 649 (38 S. Ct. 278)), we quote:

"We find it unnecessary to determine it. As we have shown, the master found the value of complainant's entire plant, including these water rights, to be

$13,415,899. Deducting $1,998,117, the entire value of the disputed rights, there remains a valuation of $11,-417,782. No part of this is seriously disputed except the item for going-concern value, upon which we already have passed. The master found that the net earnings of the company under the ordinance of 1914 would be $488,820. No question is made about this, except some slight criticism of the depreciation charges that enter into the calculation; a criticism that we cannot sustain. The net return, therefore, is found to be only 4.2812 per cent. of the value of the plant, excluding the disputed water rights; while there is no controversy over the master's finding that the prevailing rate of interest for secured loans on business and residence properties in Denver is about 6%, with higher rates for loans less adequately secured. As was declared in Willcox v Consolidated Gas Co., 212 U. S. 19, 48, the question of the rate of compensation that may be regarded as sufficient depends greatly upon circumstances and locality. In that case we held (p. 50) that complainant was entitled to 6% on the fair value of its property devoted to the public use. We have no hesitation in holding that the return yielded by the ordinance now before us is clearly inadequate, and amounts to a taking of complainant's property without due process of law, contrary to the provision of the Fourteenth Amendment in that regard, even excluding from consideration the disputed water rights.''

In *Northern Pacific Ry. Co. v. North Dakota,* 236 U. S. 585 (59 L. Ed. 735, 35 S. Ct. 429, Ann. Cas. 1912A, 1), the carrier earned a net profit of $847 upon movements of coal which paid a total carrying charge of $58,953. In holding that the rate which produced this small net return was confiscatory, the court said:

''But the remuneration as found is so slight as not to be more than nominal in view of the extent of the traffic, and in this aspect the finding is that the rate as to this company is noncompensatory.''

In *Norfolk & Western Ry. Co. v. Conley*, 236 U. S. 605 (59 L. Ed. 745, 35 S. Ct. 437), a rate which produced "a very narrow margin over the cost of the traffic" was condemned. We quote from the decision:

"It is apparent, from every point of view that this record permits, that the statutory rate at most affords a very narrow margin over the cost of the traffic. It is manifestly not a case where substantial compensation is permitted and where we are asked to enter the domain of the legislative discretion; nor is it one in which it is necessary to determine the value of the property employed in the intrastate business. It is clear that by the reduction in rates the company is forced to carry passengers, if not at or below cost, with merely a nominal reward considering the volume of the traffic affected. We find no basis whatever upon which the rate can be supported, and it must be concluded in the light of the principles governing the regulation of rates that the State exceeded its power in imposing it."

Since rates which ignore the carrier's right to earn a profit equal to the going rate of interest are confiscatory, it necessarily follows that rates which produce only the out-of-pocket expenses are clearly confiscatory. Such rates are uniformly condemned. We shall cite an illustrating case or two. From *Miss. R. R. Comm. v. Mobile & Ohio R. R. Co.*, supra, we quote:

"The testimony of the one member of the commission who appeared as a witness shows that the reasonableness of the order was made to turn on what the commission estimated was the 'out of pocket' cost, the immediate cash outlay in wages and fuel, of operating the six trains. But this cannot be accepted as a proper basis for determining such cost. Northern Pacific Ry. Co. v. North Dakota, 236 U. S. 585, 594, 596. * * *"

From *Northern Pacific Ry. Co. v. North Dakota,* supra, we quote:

"We have, then, to apply these familiar principles to a case where the State has attempted to fix a rate for the transportation of a commodity under which, taking the results of the business to which the rate is applied, the carrier is compelled to transport the commodity for less than cost or without substantial compensation in addition to cost. We say this, for we entertain no doubt that, in determining the cost of the transportation of a particular commodity, all the outlays which pertain to it must be considered. We find no basis for distinguishing in this respect between so-called 'out-of-pocket costs,' or 'actual' expenses, and other outlays which are none the less actually made because they are applicable to all traffic, instead of being exclusively incurred in the traffic in question. Illustrations are found in outlays for maintenance of way and structures, general expenses and taxes. It is not a sufficient reason for excluding such, or other, expenses to say that they would still have been incurred had the particular commodity not been transported. That commodity has been transported; the common carrier is under a duty to carry, and the expenses of its business at a particular time are attributable to what it does carry. The State cannot estimate the cost of carrying coal by throwing the expense incident to the maintenance of the roadbed, and the general expenses, upon the carriage of wheat; or the cost of carrying wheat by throwing the burden of the upkeep of the property upon coal and other commodities."

In 10 C. J., Carriers, p. 424, § 662, the editor cites numerous decisions holding that rates which earn only the out-of-pocket expenses, or ignore fixed expenses because the carrier will have to discharge them anyway, are confiscatory.

Nor will a rate which fails to equal the value of the service rendered be sustained by proving that the carrier secures an adequate return from the rest of

its business. From *Chicago, Milwaukee & St. Paul Ry. Co. v. Public Utilities Commission,* 274 U. S. 344 (47 S. Ct. 604, 71 L. Ed. 1085), we quote:

"The evidence introduced by the carriers was sufficient to warrant, if not to require, a finding that, as to the lines of all the petitioners, the intrastate log rates in question are very low in comparison with the rates on other commodities; and that, as to the Chicago, Milwaukee and Saint Paul and the Great Northern, they are confiscatory. But, as appears from their opinions, the respondent and the court refused to consider and give weight to that evidence because, as they held, the intrastate log rates were not to be dealt with separately but were to be considered in connection with the interstate lumber rates, and because the carriers made no showing as to the gains or losses resulting from the interstate transportation. That cannot be sustained. The carriers cannot maintain interstate lumber rates higher than otherwise justified by showing that they suffer loss or have inadequate returns from the intrastate transportation of logs. The State has no power to require petitioners to haul the logs at a loss or without compensation that is reasonable and just, even if they receive adequate revenues from the intrastate log haul and the interstate lumber haul taken together."

In *Northern Pacific Ry. Co. v. North Dakota,* supra, the Federal supreme court said:

"In such a case, it would be no answer to say that the carrier obtains from its entire intrastate business a return as to the sufficiency of which in the aggregate it is not entitled to complain. Thus, in Lake Shore & Michigan Southern Ry. v. Smith, 173 U. S. 684, the regulation as to the sale of mileage books was condemned as arbitrary without regard to the total income of the carrier."

In *Hackworth v. Missouri S. R. Co.,* 286 Mo. 282 (227 S. W. 1032, 15 A. L. R. 170), the court held that the rate fixed by the public service commission of

Missouri for the shipment of ties upon defendant's 45-mile railroad was confiscatory though the rate upon other commodities yielded the road a profit. From the decision, we quote:

"As I read this opinion from our highest court, and the one which has the power of final action upon the Federal question herein involved, the theory of the trial court in the instant case was wrong. Both counsel agree as to the theory of the trial below, and that theory clearly contravenes the rule in Northern P. R. Co. v. North Dakota, supra. Under the conceded facts this rate upon railroad ties was so inadequately low as to be confiscatory. It is a wholesome rule for the state, in making rates to obviate a rate which will compel the carrying of a commodity at a loss. If the state can do that, it can compel some commodities to be carried free, and give the railroad fair net earnings by having high rates on other commodities. In these days of enlightened rate experts, it is not hard to determine whether or not a given rate upon a particular commodity will bear its reasonable proportion toward a fair income from a whole schedule of rates, after paying its legitimate proportion of carriage cost. Nor is it hard to determine in these days, whether a given rate upon a particular commodity entails loss upon the carrier. The rate in question here is confiscatory under the conceded facts and the Federal rulings, and when the Federal Constitution is applied that portion of the law must fall."

From an annotation in 15 A. L. R. 185, we quote:

"The rule now appears to be that a state cannot establish a rate for a particular commodity which is below the cost to the carrier of handling that commodity, or which, considering all the traffic to which the rate applies, leaves no reasonable margin above such cost, even though, when the intrastate rates on all commodities are taken into account, the total receipts of the carrier are remunerative."

In *Hammond Lumber Co. v. Public Service Comm.*, 96 Or. 595 (189 P. 639, 9 A. L. R. 1223), this court recog-

nized the principles stated in the foregoing decisions. We were there concerned with virtually the same problem which is before us now; that is, the rates which a logging railroad could properly charge. We there stated:

"We might well rest here, but as to interest on the investment, it seems that a reasonable rate should be allowed from the beginning of the undertaking. It is fair compensation for the use of the money, and it matters not whether that is paid directly to the company or is passed on to the one from whom the company borrows the money. If the charge is reasonable it ought to be allowed."

In that case, in addition to allowing the carrier to determine the rate by totaling the direct costs, the indirect costs, profits, etc., we permitted the carrier to add an additional item, that is, an annual sum for the amortization of the investment. In so holding the decision declared:

"But it is equally true in principle that the company is entitled to such rates as will fairly compensate it for the services rendered and for depreciation of its plant employed in such service, even though it reaches the vanishing point. In other words, the company ought to be allowed to come out even, in an undertaking which may reasonably be expected to exhaust itself, and besides quitting whole, to receive a fair compensation for its services. The carrier ought not to be compelled to sacrifice its plant and be content merely with compensation amounting only to interest on its value. To ignore this principle would to be violate the constitutional inhibition already quoted. A public service corporation cannot be expected to sacrifice its property for the public good. Nor is it bound to see its property gradually wasted by wear and decay without making provision for its replacement. It is entitled to earn enough not only to meet the expenses of current repairs, but also to provide means for replacing the parts of the plant when these can no longer be used."

The following quotation from *Utilities Commission v. Springfield Gas Co.*, 291 Ill. 209 (125 N. E. 891), will bring to a close our quotations from the authorities:

"The rate established must be just and reasonable, both to the public and to the utility. In Public Service Gas Co. v. Utility Comrs. 84 N. J. L. 463, (87 Atl. 651,) it is said that a just and reasonable rate can never exceed,—perhaps can rarely equal,—the value of the service to the consumer, and on the other hand it can never be made by the compulsion of public authority so low as to amount to confiscation; that a just and reasonable rate must therefore certainly fall between these two extremes, so as to allow both sides to profit by the conduct of the business and the improvement of methods and increase of efficiency; that justice to the consumer, ordinarily, would require a rate somewhat less than the full value of the service to him, and justice to the company would ordinarily require a rate above the point at which it would become confiscatory; that to induce the investment and continuance of capital there must be some hope of gain commensurate with that realizable in other business, and that the mere assurance that the investment would not be confiscated would not suffice. Ordinarily that is a reasonable charge or system of charges which yields a fair return upon the investment. (Brymer v. Butler Water Co., 179 Pa. St. 331, 36 Atl. 249.) Generally speaking, a rate which is non-confiscatory would not be so unjust and unreasonable as would authorize setting aside the decision of the commission fixing such a rate, (Public Utilities Com. v. Toledo, St. Louis and Western Railroad Co., 267 Ill. 93; Chicago, Milwaukee and St. Paul Railway Co. v. Public Utilities Com., 267 id. 544,) and yet there is a difference between a rate which is merely non-confiscatory and one which is just and reasonable, and it is the just and reasonable rate which the commission is called upon to fix. The utility is entitled to demand that no more be exacted from it than the services rendered are reasonably worth. * * * A just and reasonable rate, therefore, is

necessarily a question of sound business judgment rather than one of legal formula, and must often be tentative, since exact results cannot be foretold. (Public Service Gas Co. v. Utility Comrs., supra.) Like so many other questions in the law that involve reasonableness of conduct, it is a question of fact to be settled by the good sense of the tribunal it may come before. * * * The real test of the justice and reasonableness of any rate seems to be that it should be as low as possible and yet sufficient to induce the investment of capital in the business and its continuance therein. This, also, is a business question and depends on the opportunities that may be offered for more profitable investments and the risk involved."

In the two following cases the legal principles above mentioned, or at least some of them, were applied by the United States supreme court to log rate cases and in each that court held confiscatory log rates established by orders of state utility commission and affirmed by the state courts. In *Northern Pacific Railway Co. v. Department of Public Works,* 268 U. S. 39 (45 S. Ct. 412, 69 L. Ed. 836), the facts were that the rates upon log shipments in Washington had been twice increased 25 per cent by the carriers, and then the public service commission of that state instituted a proceeding for the investigation of the rates. After a hearing in which the carriers participated the commission ordered a reduction of the rates. Thereupon the carriers instituted a suit in the superior court of Washington, praying that the commission be restrained from putting into effect its rate-reducing order. After trial the suit was dismissed. This decree was affirmed by the supreme court of Washington (125 Wash. 584 (217 P. 507)). In holding that the Washington courts had erred in dismissing the carriers' suit and in failing to hold that the commission-made rate was con-

fiscatory, the Federal supreme court said that the evidence presented by the carriers showed that the existing rates did not defray fully the cost of hauling logs. It then said:

"Instead of attempting to show by evidence reasonably specific and direct what the actual operating cost of this traffic was to the several carriers, the department created a composite figure representing the weighted average operating cost per thousand gross ton miles of all revenue freight carried on the four systems, and made that figure a basis for estimating the operating cost of the log traffic in Washington."

The court held that since the carriers' evidence showed that the established rate was not yielding a profit, and since the evidence in support of the commission-made rate failed to show the cost of the haul, the carrier-made rate should never have been set aside. Before leaving this decision it is worthy of note that in the instant case the Spaulding Company made but little effort to show the cost of the haul. It confined its efforts to proof of direct cost and proof of the charges made by other carriers. In *Chicago, etc. Ry. Co. v. Public Utility Commission*, supra, being the second of the two decisions just mentioned, the rate under attack had been established by an order of the Idaho utilities commission and had received the approval of the Idaho supreme court (41 Idaho 181 (238 P. 970)). Indeed, the local commission did not reduce the rates until a blanket order of the interstate commerce commission had permitted reductions. Nevertheless, since the evidence failed to show that the rates established by the carriers were unreasonable, the Federal supreme court held that the utility commission was not justified in reducing them, and that the Idaho court erred when it approved them. These two decisions merely employed the principle mentioned in several of the above-cited

decisions, and in many others which we have not cited, that findings and orders of commissions, not supported by substantial evidence, are void.

Let us now endeavor to apply the above-mentioned principles of law to the facts before us. It must. be evident that if the plaintiff is to earn its expenses and have an opportunity of earning a profit the rate charged upon log shipments can not be deemed unimportant. The plaintiff does not have many shippers, nor does it haul an extensive variety of commodities. If the Spaulding Company had resumed the shipment of logs in 1933 at the rate of several cars per day, its shipments, in volume at least, would have equalled, if not exceeded, the business of all other shippers along the line.

It is necessary to have clearly before us the effect of the reduction made by the attacked order. The carrier-made rate is $3.90 per thousand feet, or $30.77 on a car of 7,890 feet (1929 average load). The commission-made rate is $20 per car without any limit upon the amount of the load. The reduction, therefore, appears to be 36 per cent, but, as a matter of fact, it is much greater for the reason we shall now state. The testimony of the Spaulding witnesses themselves indicates that where carload rates are in effect it is customary to load cars with about 10,000 feet. These witnesses testified that sometimes 13,000 feet is placed aboard cars. One of the plaintiff's witnesses testified that in the state of Washington, where carload rates are in effect, cars are frequently loaded with 12,000 to 13,000 feet. It will be observed that if 10,000 feet is placed aboard the cars the reduction in rates will be about 50 per cent, and that if the car is loaded with 12,000 feet the reduction will be even more.

In applying the above legal principles to the instant case, let us revert to the Washington and Idaho log rate cases just mentioned. It will be observed that in those two cases the Federal supreme court, in setting aside rates made by the local utility commission and approved by the local courts, employed the rule that a carrier-made rate cannot be set aside by the commission unless those attacking the rate prove that it is unreasonable, and, since no such proof was in the record, the Federal supreme court set aside the commissions' rate reduction orders. The same result ought to follow in this case. In fact, here it is even more warranted. In the Washington case the commission, composed of more than one man, was non-partisan. In that case the decision of the supreme court of Washington (125 Wash. 584 (217 P. 507)) reviewed the evidence and found that the carrier-made rate was unreasonable and that the commission-made rate was reasonable. Yet, notwithstanding all of this, the commission-made rate was set aside by the United States supreme court when it found no evidence in the record showing that the carrier-made rate was unreasonable. The same observations are applicable to the Idaho log rate case. The Idaho court (41 Idaho 181 (238 P. 970)) after reviewing the circumstances concluded that the carrier-made rates were unreasonable and that the commission-made rates were justified. Nevertheless, they, too, were set aside. In the instant case, the shipper made virtually no effort to prove that the carrier-made rates were unreasonable. It showed the direct cost of the haul and presented proof of charges made by other carriers. The other facts presented by the shipper were incidental to the proof just mentioned. Even now neither the commissioner, the circuit court nor ourselves know the indirect cost which the Southern Pacific Company

sustains in hauling log trains from Independence to Winona, a distance of more than 11 miles. There is not one word in the record showing the expense which that company sustains in maintaining its right of way, paying taxes, etc., upon this branch line. How it was possible for the commissioner to make the rate which he did in the absence of this information, only he knows. Rate-making is not a matter of magic; surely it is not a matter of guesswork; like all other computation, it is dependent upon a knowledge of the facts. When the commissioner entered his first order he had virtually no evidence except (a) the direct cost of the haul, and (b) the charges made for log hauls in other places. It was not until testimony had been taken in the circuit court that the record was amplified by evidence of the indirect costs sustained by the plaintiff in making the haul. Even then the Southern Pacific Company's indirect costs were not shown. Every court which has spoken upon the subject has held that rates which yield only the direct cost of the service are confiscatory, and, as we have also seen, rate tariffs in effect upon other roads are not persuasive unless accompained by proof that the circumstances affecting them are virtually the same as upon the road in question. See also Hutchinson, Carriers (3d Ed.), §§ 533 and 580. Hence, there is as much reason here as there was in the Washington and Idaho log rate cases for holding void the order of the public utilities commissioner.

In preceding paragraphs we endeavored to compute the entire cost of the haul from Olson to Winona, using for the direct cost the computations of Mr. Newell, which, as we have seen, were not only too low but were admitted to be too low. In determining the indirect cost of the haul from Olson to Independence, we took figures the accuracy of which is virtually unquestioned. These

computations indicate that the cost of the haul can not be brought anywhere near the commission-made $20 rate. Newell did not believe that his estimates of 1933 costs were practical unless the cost of labor and materials declined about one-third. In fact, he expressly conditioned his estimates upon such declines. But declines have not occurred. Yet if we take his reduced costs, reducing by one-third every item affected by labor and material expenses, and use the percentage 10.9, the cost of the haul becomes only a few cents less than $20. This, however, allows nothing for the Southern Pacific Company's indirect costs, and allows neither company any profit whatever.

It is evident that when the commissioner made the $20 rate he believed that Mr. Newell's predictions of a decline in costs would materialize. The justification for this statement is found in the facts to which we shall now allude. In March, 1933, when the testimony was being taken before the commissioner, the depression had reached virtually its lowest levels. For a few days at least, in March, 1933, every bank, stock and commodity exchange was closed. The prices of labor and materials had sunk to very low levels. The plight of debtors was making such a strong appeal to legislative bodies that moratorium laws were being enacted in many of the states. See 1933 Session Laws, p. 922. In *Teachers' R. F. Assn. v. Pirie*, 150 Or. 435 (46 P. (2d) 105), we took note of the conditions existing in June of 1933 and held that, due to the want of fair prices for realty at that time, the circuit court should not have confirmed a foreclosure sale made in that month. It seems clear that Newell's predictions made at such a time must have exerted a strong influence upon the commissioner, and it likewise seems clear that had the commissioner known that before the rates would go

into effect costs, instead of declining, would move upward under the spur of the National Recovery Act, he would not have made the rate of $20.

We now know to a high degree of certainty the costs which the plaintiff incurs in hauling logs; at least, we know the minimum. When these minimums are added they invariably exceed the $20 by a margin of several dollars. We realize that the cost of rendering the service is not always the determining factor in rate-making. In passing, however, we note that the plaintiff's line is efficiently and economically operated and that, therefore, further economies can not be expected. This being true, we know of no reason why the cost of hauling logs, assuming a normal movement of traffic, should not reveal the value of the service. The authorities declare that the operating expenses should be considered in determining the reasonableness of rates, and that in determining the operating expenses the court should not limit its inquiry into the mere cost of running trains, but should also consider reasonable renewals and improvements in roadbed, track, equipment, etc. The authorities are cited in 10 C. J., Carriers, p. 419, § 654. In the present instance, the cost of operation was pared by Mr. Newell to the bone; in fact, to the marrow. But when we accept his compilations and ignore the two items of $20,000 and $6,000, still we can not crowd the cost down to the $20 rate. And even after we have failed by a margin of several dollars to get down to the $20 rate, we have allowed nothing to the Southern Pacific Company for indirect costs, and have allowed neither company any profit.

In support of the contested rate, respondents suggest that its low amount may produce new business and thus add to the carrier's income. But the evidence

shows that timber owners are unwilling to cut their timber for today's meager price. Had any timber owner along the line contemplated making shipments under the $20 rate, it is reasonable to assume that he would have been called as a witness when testimony was being taken.

It is argued that we should give some heed to economic conditions. Such an argument was pressed upon the Federal supreme court in *Reagan v. Farmers Loan & Trust Co.*, 154 U. S. 362 (38 L. Ed. 1014, 14 S. Ct. 1047), in the midst of another severe depression. That court, however, refused to force the carrier into insolvency by compelling it to carry commodities at losing rates, pointing out that it is a very different matter when a business enterprise suffers a loss through business conditions and when "the strong arm of the law is invoked to compel parties engaged in legitimate business, and which can not be abandoned at will, to so reduce their charge for service as to make the carrying on of that business result in a continued loss. In the one case the law is powerless to prevent injury; in the other, it is used to work injury". See also Hutchinson on Carriers (3d Ed.) § 530. Nothing would be gained by forcing ruinous rates upon this carrier, which has confined itself to sound business principles and has refrained from indulging in the luxury of bond issues, etc. The commissioner could not reduce the rate for mere economic reasons.

It may be that a rate of $3.90 per thousand feet is high, and that the Spaulding Company can not resume operations under it until the lumber market improves. However, as already stated, that company is suffering from two disadvantages: it is farther from its log supply than any other lumber manufacturer with which it

competes; and it is subject to a joint haul. If it chose to buy its timber in a district which can not enable the carrier to obtain sufficient density of traffic to make low rates, it can not insist upon the same favorable rates obtained in districts where the carriers daily operate several trains each composed of long strings of cars.

We now state our conclusion that the order establishing the rate of $20 per car appropriates the carriers' property to a use beyond that contemplated when they voluntarily became common carriers, for the $20 rate compels them to haul saw logs without hope of profit and at a loss. The rate is confiscatory and, therefore, illegal. Enforcement of the public utilities commissioner's order should, therefore, be enjoined.

We have not overlooked the contention of the respondents that no apportionment of the rate has actually been made by the carriers, and that therefore it can not be said that the plaintiff will receive less than the value of the service it renders. Under the $3.90 per thousand feet the plaintiff received as its share $21.92 for a car containing 7,890 feet. The Southern Pacific Company received the balance, and the evidence indicates that in future it proposes to insist upon a sum substantially similar if the defendant's rate goes into effect. The record clearly indicates that neither carrier will be willing to take less than the cost of the haul. Since the Spaulding Company has not attacked the Southern Pacific Company's indirect costs, a conclusion seems warranted that it does not claim that that carrier is charging more for its portion of the haul than is reasonable. It is our belief that this contention possesses no merit.

Nineteen-thirty-one Session Laws, chap. 103, § 6, and 1933 Session Laws, chap. 441, § 36, which amend

§§ 61-245 and 61-254, Oregon Code 1930, repeatedly use the words "findings" and "order". These amendments, as well as our public utility statute, prior to amendment, afford as reasonable a premise for a conclusion that a rate-making order must be accompanied by findings upon the material facts as does the Interstate Commerce Commission Act.

The United States supreme court has consistently refused to examine transcripts of evidence when the commissioner made no finding of fact upon the controverted issue. In such instances it resolves the issue against the commission-made rate. A recent instance is *A., T. & S. F. Ry. Co. et al. v. United States et al.*, decided by the Federal supreme court April 29, 1935.

From it we quote:

"Its report does not disclose the basic facts on which it made the challenged order. This court will not search the record to ascertain whether, by use of what there may be found, general and ambiguous statements in the report intended to serve as findings may by construction be given a meaning sufficiently definite and certain to constitute a valid basis for the order. In the absence of a finding of essential basic facts, the order can not be sustained."

For a statement showing what the findings should contain see *Utilities Commission v. Springfield Gas Co.*, 291 Ill. 209 (125 N. E. 891).

It is our belief that the absence of findings upon the basic facts is fatal to the commissioner's order.

It has been suggested, not, however, by these respondents, that the rate should be put into effect for an experimental period. Let us not lose sight of the fact that the contested rate was made by a partisan. No court has ever compelled a carrier which claimed

that the commission-made rate was confiscatory to experiment with it when the commissioner was the partisan of the shipper. In *Hammond Lumber Co. v. Public Service Commission,* supra, where we authorized the rate to be put into operation for an experimental period, the public service commission findings stated that the rate would return to the carrier a profit. The plaintiff in that case was not the carrier but a shipper. In the present instance, there is no finding that the rate will return a profit. In the first decision which employed the experimental plan (*Tilley v. Railroad Co.,* 5 Fed. 641, 4 Woods 427) the commission's findings stated that the rate schedule would yield a profit of 8 per cent. The courts have consistently refused to experiment with rates where the evidence indicated that the rate would not yield a profit. An instance is *Northern Pacific Ry. Co. v. Dept. of Public Works,* supra, which we have already reviewed. In that case the commission's order reducing the log rates in western Washington expressly stated that the rate should be experimental for a 12-month period, yet the decision of the Federal supreme court, written by Mr. Justice Brandeis, held that this feature could not save the rate. Courts resort to experimental periods only where the evidence is conflicting, the facts are uncertain, or where the margin between possible confiscation and valid regulation is narrow. The authorities upon which we rely are cited in Watkins, Shippers and Carriers (4th Ed.), § 50, and in the annotation to L. R. A. 1915A, p. 65. Furthermore, the evidence taken in 1933 showed that the plaintiff had $20,000 of deferred maintenance, and that $12,000 would have to be spent to render plaintiff's bridges safe for the passage of log trains. Accordingly, if we require the carriers to experiment it will be very costly to them. If, at the end of

several months, it develops that the rate is too low, and must be raised, the shipper may be expected to discontinue the log movements, and the carrier will have no means of recovering the sums spent upon deferred maintenance. Therefore, we would not be warranted in ordering the carriers to experiment with this rate.

I dissent.